## Commonwealth, Appellant, *v.* Teada.

Argued June 10, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Joseph H. Reiter*, Special Deputy Attorney General, with him *Barnett Satinsky*, Deputy Attorney General, and *Robert P. Kane*, Attorney General, for Commonwealth, appellant.

*George W. Westervelt, Jr.*, with him *George Royle, IV*, and *Cohen, Royle and Ticktin*, for appellee.

OPINION BY WATKINS, P. J., September 22, 1975:

This is an appeal by the Commonwealth from a demurrer sustained by the Court of Common Pleas of Monroe County, Criminal Division. The defendant was charged with a violation of the Act of 1972, April 14, P.L. 233, No. 64; 35 P.S. §780-113 (a) (30), a Section of The Controlled Substance, Drug, Device and Cosmetic Act.

The appellee, Chris Teada, was arrested on May 20, 1974 and charged with selling phencyclidine to a police undercover agent. The trial was held on October 8, 1974. At the trial the Commonwealth established that a substance sold to the undercover agent contained a quantity of phencyclidine hydrochloride. The Commonwealth's evidence failed to establish the amount of the proscribed substance contained in the material sold to the agent. Also there was no evidence that the quantity of the proscribed substance delivered would have a potential for abuse associated with a depressant effect on the central nervous system. It was for these failures that the court below sustained defendant's demurrer to the Commonwealth's case.

The section of the act under which appellee was charged provides as follows:

"(3) Schedule III—In determining that a substance comes within this schedule, the secretary shall find: a potential for abuse less than the substances listed in Schedules I and II; well documented and currently accepted medical use in the United States; and abuse may lead to moderate or low physical dependence or high psychological dependence. The following classes of controlled substances are included in this schedule:

"(i) Any material, compound, mixture, or preparation unless specifically excepted or unless listed in another schedule which contains any quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system:

"1. Any substance which contains any quantity of a derivative of barbituric acid, or any salt of a derivative of barbituric acid.

"2. Chorhexadol.

"3. Glutethimide.

"4. Lysergic acid.

"5. Lysergic acid amide.

"6. Methyprylon.

"7. PHENCYCLIDINE.

"8. Sulfondiethylmethane.

"9. Sulfonethylmethane.

"10. Sulfonmethane." (Emphasis added) 1972, April 14, supra.

The issue revolves around the words which provide that the substance enumerated in this section must have "a potential for abuse associated with a depressant effect on the central nervous system." The Commonwealth argues that these words modify the word *substance* in the statute and that the purpose of these words is to serve as a guide to the Secretary of Health in placing other substances within this particular category, that is to say that any new substances proscribed under this section must be

ones that have a potential for abuse associated with a depressant effect on the central nervous system. The appellee argues, and the lower court held, that the words in question modify the word *quantity* in the above clause and that therefore the Commonwealth has the burden of proving that the substance sold contains a sufficient quantity of one of the proscribed substances enumerated in this section, so as to have a depressant effect on the central nervous system. This the Commonwealth failed to do. Therefore, the question is purely one of statutory construction. In enacting this section did the legislature intend to prohibit the sale of *all* substances containing *any* quantity of the proscribed substances or did it merely intend to prohibit the sale of substances containing a sufficient quantity of the proscribed substance so as to have a depressant effect on the central nervous system?

The answer to this question becomes clear when we look at this Act, supra, in its entirety. Schedule I of the Act, supra, lists those substances which have a high abuse potential and no accepted medical use such as heroin and marijuana. The sale or possession of these substances is illegal without regard to quantity. Since these substances have no legitimate use no inquiry into the quantity delivered or possessed is necessary in order to establish its illegality. Schedule II of the Act involves those substances which have a high abuse potential, but for which there is an accepted medical use. Subsection (i) and (ii) of Schedule II list various substances without regard to quantity. However, subsection (iii) lists four substances stating that the quantity of these substances must have a "potential for abuse associated with a stimulant effect on the central nervous system." Furthermore that subsection goes on to proscribe the possession or delivery of one particular substance, methamphetamine, without regard to quantity. See, 35 P.S. §780-104 (2) (iii). Obviously the legislature enacted this subsection because it considered methamphetamine in any quantity to be more dangerous

than the other substances enumerated in Schedule II. The statutory scheme is one of imposing greater restrictions on the more dangerous substances and of imposing greater proof requirements on the prosecution as the criminal inquiry moves from the most dangerous substances to the least dangerous ones.

With this in mind, when we look at Schedule III of the Act it is apparent that the legislature did intend to place quantitative proof requirements on the Commonwealth with regard to the substances enumerated under subsection (i) 2-10 (Phencyclidine is number 7 on the list). This becomes clearer when we note that Item I of that section, barbituric acid, contains no such need for quantitative analysis. The reference to "any quantity" when mentioning barbituric acid demonstrates that the legislature clearly intended the quantitative requirement when it prohibited the delivery or possession of "any quantity" of the substance that it specifically wanted to prohibit, that is, barbituric acid. But the legislature did *not* specify that *any* quantity of the substance set forth in numbers 2 through 10 was proscribed. It proscribed only possession or delivery of substances which have a "potential for abuse associated with a depressant effect on the central nervous system." Thus, the Commonwealth would have the burden of proving at trial that the substances enumerated is Schedule III (i) (2-10) of the Act have a potential for abuse associated with a depressant effect on the central nervous system.

Subsection (v) of Schedule III also reinforces the language requiring quantitative proof. That section permits the Secretary of Health to exempt from control any compound containing a substance enumerated in subsection (i) and (ii) if the compound has other ingredients which negate the depressant effect on the central nervous system. 35 P.S. §780-104 (v) (Supp. 1974). Thus, the intent of the legislature is to prohibit possession or delivery of compounds containing a quantity of the enumer-

ated substance that is sufficient to be potentially abused by use as a depressant of the central nervous system and no prohibition of the substance is intended when the quantity of the substance is insufficient to act as a depressant. Since the courts must assume that the legislature intends every word of a statute to have effect we cannot ignore Subsection (v) of Schedule III nor the wording of Schedule III (i) which specifically proscribes the delivery or possession of barbituric acid in *any* amount while *not* specifically providing so far as the other 9 substances set forth in that section. 1 Pa. C.S. §1922 (2) (Special Pamphlet, 1973). To hold as the Commonwealth contends would render the wording of Schedule III (i) (1) mere surplusage and would negate the clear intent of the legislature. Also we must recognize the principle that penal statutes must be strictly construed against the Commonwealth. 1 Pa. C.S. §1928 (b) (1) (Special Pamphlet, 1973). If two inconsistent interpretations of statutory language are both reasonable, the benefit of the doubt must inure to the defendant's position.

In this case we are not presented with such a situation because the wording of the Act clearly manifests the intent of the legislature that certain substances must be present in quantities having a depressant effect on the central nervous system before their delivery or possession becomes criminal. Otherwise, the sale, delivery or possession of many common non-prescription drugs such as aspirin, anacin, some cough syrups, etc., could be the subject of criminal prosecution if they contained even minute quantities of some of the substances enumerated in Schedule III (i) (2-10) of the Act.

Order affirmed.

---

DISSENTING OPINION BY PRICE, J.:

Phencyclidine has the ability to produce hallucinations and is becoming known on the street as "Angel Dust." Both the Congress of the United States and the

Pennsylvania Legislature have found that because of its hallucinatory effect and its depressant effect it has a potential for abuse. Its sole legitimate use had been in a solution prepared by Parke and Davis for veterinary use, but this has, according to my research, been discontinued for the past three or four years. Thus, it has no accepted medical use that I can ascertain. In any event, phencyclidine has been, by legislative mandate, included in the Federal and Pennsylvania statutes as a prohibited drug.

I must dissent because I believe the majority has placed a strained construction upon the clear language of the statute. The Pennsylvania Controlled Substance, Drug, Device and Cosmetic Act[1] provides in pertinent sections as follows:

"780-104—Schedules of Controlled Substances. The following schedules include the controlled substances listed, or to be listed. . . .

. . . .

(3) (i) *Any* material, compound, mixture, or preparation unless specifically excepted or unless listed in another schedule which contains *any* quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system:

. . . .

7. Phencyclidine." (emphasis added)

As I read this section, it seems clear that the legislature intended to control any quantity of phencyclidine and that the phrase "having a potential for abuse associated with a depressant effect on the central nervous system" is a legislative finding, supported by the history of the drug, that this *substance* should be prohibited in *any* quantity. This phrase modifies the word substance which appears immediately before it and is, to my view, only to

---

1. Act of April 14, 1972, P.L. 233, No. 64, §1 (35 P.S. §780-101) *et seq.*

serve as a guide to the Secretary of Health in placing new drugs onto that schedule.

Any other construction conflicts with the plain meaning of the Pennsylvania statute. The majority construes the phrase to modify the word "quantity" which seems to me to be violative of ordinary good English rules. Further, the majority construction places upon the Commonwealth, in every case involving this language, the burden of establishing anew the legislative finding that these substances have a potential for abuse related to a depressant effect on the central nervous system. Such a requirement would be to render the legislative finding useless and destroy the statutory scheme. It would, if adopted, transfer the control of these substances to the fact-finder, whether it be judge or jury, rather than vesting that initial decision with the legislature. It would turn each trial into a rehash of the prior legislative hearings which have already heard and determined that these substances have a potential for abuse. It would produce no uniformity, for each judge or jury could reach a different, conflicting conclusion. It would, if adopted, substitute the fact-finder's judgment for that of the legislature and require that in each case the Commonwealth produce the same scientific data already heard and accepted by the legislature. Clearly then the majority does not implement what I conceive to be the clear intent of the legislature. Nor do I perceive any danger that the sale, delivery or possession of many common non-prescription drugs such as aspirin, anacin, some cough syrups, etc., could be the subject of criminal prosecution. At least in the case of phencyclidine such is clearly not the case, for it now has no accepted medical use of which I am aware.

I would reverse the grant of the demurrer and remand the case for trial.

JACOBS, J., joins in this dissenting opinion.