390 A.2d 1282

**COMMONWEALTH of Pennsylvania**

v.

**Samuel N. BROUGHTON, Appellant.**

Superior Court of Pennsylvania.

Argued June 17, 1977.

Decided July 12, 1978.

Rehearing Denied Aug. 18, 1978.

370

David Richman, Philadelphia, with him Ronald W. Morrison, Sr., Philadelphia, for appellant.

Stephen S. Seeling, Assistant District Attorney, with him F. Emmett Fitzpatrick, District Attorney, Philadelphia, for Com., appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This appeal is from a judgment of sentence for perjury under the Crimes Code, Act of Dec. 6, 1972, P.L. 1482 No. 334, § 1, eff. June 6, 1973, 18 Pa.C.S.A. § 4902(a).

Appellant was indicted for perjury and false swearing after he testified before a Special Investigating Grand Jury, empaneled to investigate possible corruption and mismanagement in the Food Services Division of the School District

of Philadelphia. Appellant's testimony was sought in connection with allegations that certain senior executives in the Food Services Division were receiving kickbacks from food brokers for waiving bid specifications.

Appellant appeared before the grand jury on a number of days in November, 1975. He was questioned about the source of a $2500 cash deposit to his bank account, made on September 3, 1974; the amount was one percent of a $250,-000 contract received by the Shane Meat Company during the period of August and September, 1974. Appellant testified that about the first of September, 1974, he had placed a bet in a numbers lottery, which resulted in his winning $6,400. He said he usually bet the number 529, which represented the final digits of his military serial number, but that on this occasion his bet must have been misrecorded because he was paid on the basis of a "hit" on number 579. When asked with whom he placed the bet, he replied: "The person I was dealing with was one Roger Kellcy or Kesley," who operated in West Philadelphia; that a woman named Penny, who "took the numbers," had notified him that he had hit; and that another man, unknown to him, had paid him off. Part of the proceeds, he said, was deposited in the account and represented some or all of the $2,500 in question.

This explanation was the basis of the indictment. At the trial, which was without a jury, the Commonwealth presented lay and expert evidence to prove the following:

1. That appellant worked in the Food Services Division, and that his duties included acting as a liaison between the Food Services Division and the Purchasing Division.

2. That sometime in the period of September to November, 1974, appellant asked one Thomas Lloyd, a co-worker of appellant's at the time, about the date a particular number had paid off, and that appellant and Lloyd examined a "Lucky 13 Red Horseshoe Number Card" published July 1, 1972. There was no discussion concerning the card, and Lloyd was unable to recall the number in question.

3. That 579 was the winning number on September 4, 1974, or one day after appellant's deposit; that it was the winning number on no other day between September 1 and September 7, 1974; and that there was only one winning three digit number each day for the Philadelphia area.

4. That if a numbers bettor consistently played one "pet" number, it would be unlikely for that bettor to be paid if the number were misrecorded and won.

5. That one Roger Kelsey was a known figure engaged in the numbers racket, and operated in West Philadelphia, but that he died on February 10, 1973.

Appellant was convicted of perjury, with the trial judge making no finding on the charge of false swearing. After post-trial motions were denied, and sentence of imprisonment from nine to twenty-three months was imposed, this appeal was taken.

–1–

The evidence will be discussed in some detail later, but from the foregoing recitation it may be seen that the evidence is strong that appellant's testimony about a numbers hit was false. Appellant, however, argues that the evidence is nevertheless fatally deficient in that it is circumstantial.

Perjury has traditionally been subject to special requirements of proof.[1] *See* VII *Wigmore on Evidence* § 2040 *et seq.* (3d ed. 1940). In Pennsylvania, the special requirements were part of the case law accompanying the previous perjury statute, Act of June 24, 1939, P.L. 872, § 322, 18 P.S. § 4322. In *Commonwealth v. Field,* 223 Pa.Super. 258, 298 A.2d 908 (1972), we stated:

> The two-witness rule, as it is applied in Pennsylvania, requires that the falsity element of a perjury conviction be supported either by the direct testimony of two witnesses or *by the direct testimony of one witness plus corroborating evidence.*

1. We will discuss the origins and justifications for these requirements *infra.*

223 Pa. at 262, 298 A.2d at 911 (emphasis supplied).

The distinction between "direct" and "circumstantial" evidence has been stated as follows:

The basic distinction between direct and circumstantial evidence is that in the former instance the witnesses testify directly of their own knowledge as to the main facts to be proved, while in the latter case proof is given of facts and circumstances from which the jury may infer other connected facts which reasonably follow, according to the common experience of mankind.

29 Am.Jur.2d, Evidence § 264 at 312.[2]

Here, the evidence against appellant is circumstantial in that no one testified to having seen appellant get money from another source, that is, from a source other than the numbers bet, and deposit it in the bank. Accordingly, if the rule of *Commonwealth v. Field, supra,* is applicable, appellant's conviction cannot stand.

After *Field* was decided, however, the perjury statute was changed to read as it now does:

(a) Offense defined.—A person is guilty of perjury . . , if in any official proceeding he makes a false statement under oath . . . , or swears or affirms the truth of a statement previously made, when the statement is material and he does not believe it to be true.

\* \* \* \* \* \*

(f) Corroboration.—In any prosecution under this section . . . , falsity of a statement may not be established by the uncorroborated testimony of a single witness.

In construing these provisions the first difficulty we encounter is in the comment prepared by the Reporter for the Crimes Code; he expressed the opinion that the provisions of subsection (f) comported with existing law. Toll, *Pennsylva-*

---

**2.** Purists may argue that there is no such thing as truly direct evidence. If X has testified that he was in New York at noon on a given day, and Y testifies that at noon on that day he saw X in Philadelphia, Y's contradiction still requires the inference that X cannot be in two places at once. The dividing line between direct and circumstantial evidence is often unclear.

*nia Crimes Code Annotated* 541 (1974). The correctness of this opinion is by no means apparent. Existing law, *i. e.*, the rule of *Commonwealth v. Field, supra*, requires corroboration by "direct testimony." Subsection (f), however, only requires corroboration by "testimony"; since "testimony" is not limited by any descriptive characterization, it would seem to refer to both direct and circumstantial testimony, in other words, to change the rule of *Commonwealth v. Field.*

In his comment Toll included portions of the comments on corroboration from the Model Penal Code. Model Penal Code, § 208.20, Comment (Tent. Draft # 6, 1957). The Model Penal Code entirely abolishes the special proof requirements for perjury; but it also includes a bracketed alternative, which retains some special proof requirements, and which is substantially the same as subsection (f), later adopted in Pennsylvania.[3] In editing the Model Penal Code comments for his comment to the Crimes Code, Toll writes that he included only so much of the Model Penal Code comments as he considered relevant to the Crimes Code, Toll, *supra* at VI, that is, those comments that he considered related to the bracketed, or Pennsylvania, alternative. We quote his comments below. In quoting them, however, we include, in italics, a portion of the Model Penal Code's comments that he excluded. (What Toll refers to as subsection (e) is now subsection (f), the provision under discussion.)

A number of qualifications of the "one-witness-plus-corroboration" rule have been introduced. Thus, no contradicting witness is required where direct observation is impossible, as where defendant is accused of perjury as to his own mental state, e. g., "I don't remember." Such a prosecution can proceed entirely on circumstantial evidence. An authenticated record of conviction suffices to demonstrate the falsity of the defendant's sworn denial that he had ever been convicted of crime. If defendant on trial for perjury admits the falsity but defends on the ground of good faith, no other witness to falsity is re-

---

**3.** The Model Penal Code bracketed alternative is not exactly the same as Pennsylvania subsection (f). *See* footnote 5a, *infra.*

quired; and out-of-court admissions by the defendant, for example in letters which he has written, may perform the same function.

*The Model Penal Code Advisory Committee recommended elimination of the corroboration rule; and this position was adopted by the Council.*

The Reporter continues to favor retention of some special proof safeguards in this area, as indicated in . . . [Subsection (e)]. This would apply to a narrow class of cases, which would rarely be prosecuted anyway: namely, where there is no other evidence but the testimony of a single contradicting witness. Under this rule a case can be established without any directly contradicting witness, e. g., circumstantially, by record of conviction, by defendant's admissions. Also, contrary to the Weiler case it would not be necessary to charge the jury as to a special legal rule requiring corroboration, although an admonition on this point would often be appropriate in connection with the general charge on reasonable doubt, in cases where there is little more than the single witness' testimony.

. . . [Subsection (e)] is really a special gloss on "reasonable doubt"—equivalent to saying that no pure case of oath-against-oath can satisfy the general requirement of proof beyond reasonable doubt in perjury cases.

Toll, *supra* at 553–54 (footnotes omitted).

This comment and its significance for the Crimes Code are unclear, to say the least. Specifically: In the middle of the comment appears the phrase that "[u]nder this rule a case can be established without any directly contradicting witness, e. g., circumstantially." One must therefore ask, what, does "this rule" refer to? As quoted by Toll, "this rule" seems to refer to the rule of subsection (e), (that is, of what became subsection (f) in the Crimes Code). However, this cannot be so, for subsection (e)—or (f)—does not abolish but retains the special requirement that falsity cannot be proved only by the testimony of a single witness. We conclude, therefore, that Toll misread the Model Penal Code com-

ments, and that the discussion he quotes from those comments, about "[u]nder this rule," pertains to the preferred Model Penal Code variation, which abolishes special proof requirements, not to the bracketed alternative variation, which precludes proof of falsity by the testimony of a single witness. With this reading, the comment makes sense, but we are left in irremediable doubt as to what the Pennsylvania legislature meant when it passed the statute, with the comment we have been discussing here before it, which, presumably, it carefully studied. Did it rely on Toll's opinion, and think it was passing a law that comported with existing law? Or, after comparing the previous cases with the wording of the statute, and after reading the long quotation from the Model Penal Code, did it think it was changing the law to permit proof by circumstantial evidence? We can only conclude that the legislative history is too confused to be of help to us, and so we must construe the statute without it.

At this point, there is a rule of construction that must be discussed: the rule that a penal statute must be strictly construed in favor of the defendant. *Commonwealth v. Duncan*, 456 Pa. 495, 321 A.2d 917 (1974); *Commonwealth v. Teada*, 235 Pa.Super. 438, 344 A.2d 682 (1975); *Commonwealth v. Masters of Lancaster, Inc.*, 199 Pa.Super. 36, 184 A.2d 347 (1962); Statutory Construction Act, Act of Nov. 25, 1970, P.L. 707, No. 230, added 1972, Dec. 6, P.L. 1339, No. 290, § 3, 1 Pa.C.S.A. § 1928(b)(1) (Supp.1977–78).

We acknowledge this rule of construction but do not find it dispositive here. The rationale behind strict construction of a penal statute is the injustice of convicting a person without clear notice to him that his contemplated conduct is unlawful, as well as notice of the penalties. *See Commonwealth v. Heinbaugh*, 467 Pa. 1, 354 A.2d 244 (1976). Thus, the cases that apply—or find a reason not to apply— this rule of construction are concerned with ambiguities in the wording of a statute, and thus with uncertainty about the sort of conduct covered. *See, e. g., Commonwealth v. Duncan, supra ; Commonwealth v. Shafer*, 414 Pa. 613, 202

A.2d 308 (1964); *Commonwealth v. Glover*, 397 Pa. 543, 156 A.2d 114 (1959); *Commonwealth ex rel. Varonne v. Cunningham*, 365 Pa. 68, 73 A.2d 705 (1950); *Commonwealth v. Cunningham*, 248 Pa.Super. 219, 375 A.2d 66 (1977); *Commonwealth v. Teada, supra*; cf. *Commonwealth v. Heinbaugh, supra.* The statutory ambiguity we are considering here, however, does not concern the definition of conduct made illegal. As regards *conduct*, the clarity of the perjury statute is undisputed; the uncertainty lies in the provision of the statute that sets out the *requirements of proof.*

Accordingly, in construing the provision on requirements of proof, we should not apply the rule that a penal statute is to be strictly construed in favor of the defendant. Instead, we must look to the considerations that led to the requirements being imposed at common law, and then seek a result that takes those considerations into account while at the same time giving effect to the statute.

–2–

The "two witness rule" was a rule of the ecclesiastical courts, and when it was adopted into the common law in the seventeenth century, it was the sole exception to the common law rule that a case may be proved by a single witness. *See Wigmore, supra* at 273–74. The reason for the two witness rule was the courts' reluctance to pit one oath against another:

> [I]n all other criminal cases the accused could not testify, and thus one oath for the prosecution was in any case something as against nothing; but on a charge of perjury the accused's oath was always in effect in evidence, and thus, if but one witness was offered, there would be merely . . . oath against oath.

*Wigmore, supra* at 275.

Although this reason is now inapplicable, since now an accused may testify, other reasons have been suggested for keeping the two-witness rule:

> [W]hen we consider the very peculiar nature of this offense and that every person who appears as a witness in a

court of justice is liable to be accused of it by those against whom his evidence tells, who are frequently the basest and most unprincipled of mankind . . . we shall see that the obligation of protecting witnesses from oppression, or annoyance, by charges, or threats of charges of having borne false testimony, is far paramount to that of giving even perjury its deserts.

Best, *Evidence*, §§ 605–606 (1849) (quoted in *Wigmore, supra* at 275).

Since equally honest witnesses may well have differing recollections of the same event, we cannot reject as wholly unreasonable the notion that a conviction for perjury ought not to rest entirely upon 'an oath against an oath.' The rule may originally have stemmed from quite different reasoning, but implicit in its evolution and continued vitality has been the fear that innocent witnesses might be unduly harassed or convicted in perjury prosecutions if a less stringent rule were adopted.

*Weiler v. United States*, 323 U.S. 606, 609, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945).

In summary, then, it may be said that two of the principal purposes of the two witness rule today are to protect the defendant from his own or others' good-faith mistakes,[4] and from harassment by a grudge witness, who might, himself, be tempted to commit perjury. To permit proof of falsity by circumstantial evidence alone, *i. e.*, without requiring any "direct" testimony, would be consistent with achieving the first purpose, for it is the nature of circumstantial evidence that many facts are required, and the chance of any one mistake being dispositive is reduced.[5] This would be true

---

4. In addition, the requirement of intent, 18 Pa.C.S.A. § 4902(a), may protect a good-faith defendant.

5. Some jurisdictions do allow falsity to be proved by circumstantial evidence alone. *See, e. g., United States v. Collins*, 272 F.2d 650 (2nd Cir. 1959) ("Whether the evidence is 'direct' in the sense in which the term is usually used should not be the criterion here. The test should be rather whether the evidence is of a quality to assure that a guilty verdict is solidly founded." 272 F.2d at 652); *Maragon v. United*

even if the source of the circumstantial evidence were a single witness. However, to permit proof of falsity by the circumstantial testimony of one witness alone would not be consistent with achieving the second purpose—protection against a grudge witness. Requiring testimony by two witnesses—whether both testify directly, or whether one or both testify circumstantially—does not, of course, provide conclusive protection against the grudge witness, for two grudge witnesses might be procured; but it does afford the sort of protection that the two witness rule, as reflected in *Commonwealth v. Field, supra,* has traditionally considered adequate.

■ This said, it is in order to see whether the Pennsylvania Statute [5a] has changed the two witness rule. The statute provides:

> [F]alsity of a statement may not be established by the uncorroborated testimony of a single witness.
> 18 Pa.C.S.A. § 4902(f).

We read this provision to mean that a witness may testify as to his direct observation, or he may provide circumstantial evidence; but in either case, he must be corroborated by the testimony of another witness, whose testimony may provide either direct or circumstantial evidence.

This rule represents a change from the common law two witness rule. In one sense, perhaps, it is a less strict rule, for it permits a conviction to rest on circumstantial evidence alone. However, in such event the different pieces of circumstantial evidence must fit together so tightly as to preclude any reasonable doubt of guilt. Furthermore, both of the principal purposes of the common law two witness

*States,* 87 U.S.App.D.C. 349, 187 F.2d 79 (1950) (documentary evidence); *State v. Storey,* 148 Minn. 398, 182 N.W. 613 (1921).

5a. The wording of the Model Penal Code's bracketed alternative provision is slightly different. It reads:

> No person shall be convicted of an offense under this section where proof of falsity rests solely upon contradiction by testimony of a single person other than the defendant.
> Model Penal Code, supra, at 97.

rule are achieved: the defendant is protected against good faith mistakes, and against the grudge witness. Given these considerations, we think the Pennsylvania statute, as we have construed it, to be reasonable.

As Judge HALLAM observed in *State v. Storey, supra* :

Suppose, for example, the only eyewitness to a murder should testify that the accused is not the man who committed the crime, and yet the circumstantial evidence of guilt is so strong that the jury convicts of first degree murder. With what consistency can it be said that a quality of testimony which will justify a court in condemning a defendant to life imprisonment, or, in some jurisdictions, to be hanged, is insufficient to sustain a conviction of the falsifier of the crime of perjury for which he may suffer a penalty of a short term of imprisonment.

148 Minn. at 403, 182 N.W. at 615.

–3–

█ In the case at hand, the testimony provides sufficient circumstantial evidence to prove the falsity of appellant's statement about his bank deposit.

Alexander Silverberg, who identified himself as "a publisher of various publications regarding the numbers," under various *noms de plume,* testified that according to his "Lady Dale's Day-by-Day Diary 1975," the winning number on September 4, 1974 was 579; that September 4 was the only day in the period September 1 through September 7, 1974, that 579 was the winning number; and that there is only one three-digit number each day for the Philadelphia area. While this does not, as appellant notes, rule out the possibility that there was another lottery in Philadelphia that escaped Silverberg's notice, or that unknown to Silverberg, payoffs were made on more than one number on a given day, it is nonetheless strong evidence of falsity.

The corroborating evidence was likewise strong, although appellant minimizes each piece of it.

Officer Cole, an expert witness with twenty years' experience in enforcing the vice laws, testified to the improbability of a bettor of a "pet" number being paid off erroneously. Appellant argues that this testimony "at most, tended to show the customary practice of numbers writers generally, not the practice of the numbers writers identified in this case." Brief for Appellant at 24. Such a tendency, however, is frequently the nature of expert testimony. Thus the officer's testimony was to some degree probative, even absent the evidence that appellant played the number 529 on a sufficiently regular basis with a specific numbers writer for that writer to know appellant's "pet" number. (In this regard, appellant testified that he placed a bet daily, although not usually a three-digit number. N.T. at 74–75.)

Appellant also argues that he did not specifically testify that he placed the bet in question with Roger Kelsey, but only said he "dealt with" Kelsey. This, appellant says, is not irreconcilable with his having only generally dealt with Kelsey up until Kelsey's death a year and a half before, or with his having dealt with an entirely different Roger Kelsey or Kellcy. However, appellant's grand jury testimony is clearer than he acknowledges. Thus, as to the person he placed the specific bet with, he testified as follows:

Q. Mr. Broughton, you were asked several questions before this Grand Jury on November 17th of 1975, and you refused to answer at that time until you conferred with your attorney and His Honor, Judge MIRARCHI; is that correct?

A. That is correct, sir.

Q. And it is my understanding of our conference with Judge MIRARCHI and your attorney yesterday that you have now agreed to answer questions concerning the identity of *the person with whom you placed the number 529;* is that correct?

A. That is correct.

Q. Who was that, sir?

A. The person I was dealing with was one Roger Kellcy or Kesley, K–E–L–L–C–Y or K–E–S–L–E–Y.

(Quoted at N.T. 82) (emphasis supplied).

Appellant also argues that there is no significance to the evidence that on some unspecified date in the fall of 1975 he examined a lucky 13 card published in 1972, which showed that on September 1, 1970, 529 was the winning lottery number. However, this evidence does show that appellant was interested, at a key time, in past winning lottery numbers. It may be that the card he looked at was not helpful, but that does not diminish the fact that he was interested.

Finally, it must be noted that it is a mistake to examine each piece of evidence on its own, and then to argue that individually each piece does not amount to much. It is the very nature of circumstantial evidence that while no one piece of evidence may amount to much, when added together the pieces may represent very compelling proof, strong enough to preclude reasonable doubt:

> It is generally and properly said that this measure of reasonable doubt need not be applied to the specific detailed facts, but only to the *whole issue;* and herein is given opportunity for much vain argument whether the strands of a cable or the links of a chain furnish the better simile for testing the measure of persuasion.
>
> *Wigmore, supra,* § 2497, at p. 324 (emphasis in original; footnotes omitted).

–4–

Appellant next argues that the Commonwealth's evidence failed to establish that his testimony, if false, was material. He correctly notes that there is little case law in Pennsylvania on the meaning of "material." The statute, however, now provides a test for what formerly had been only a common law requirement for perjury:

> (b) Materiality.—Falsification is material, regardless of the admissibility of the statement under the rules of evidence, if it *could have affected the course or outcome* of the proceeding.

18 Pa.C.S.A. § 4902(b) (emphasis added).[6]

■ Appellant's suggested test of materiality is whether "a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred." *United States v. Freedman*, 445 F.2d 1220, 1227 (2d Cir. 1971). In many cases the very proof of the falsity of a statement will show what the true answer was. For example, if a witness denies authorship of a letter and is proved to have lied, it is then clear that he did write the letter. *See United States v. Lasater*, 535 F.2d 1041 (8th Cir. 1976). In cases such as the one at hand, however, the true answer does not appear. Thus, even if we now know that appellant did not get the money from a numbers hit, we do not know what the *real* source was. Under appellant's test of materiality, the Commonwealth would have to prove the true answer to a question that had been answered falsely. Whether or not the Commonwealth had so heavy a burden at common law, under the statute it does not.

■ Upon applying the statute's definition of materiality, we find that the Commonwealth has met its burden. The grand jury was investigating allegations of corrupt practices in the School District food supply system; specifically, the allegations were that certain senior executives in the Food Services Division were receiving money from food brokers as a result of waiving bid specifications. Lower Court's Opinion at 2. In these circumstances it was practical for the grand jury to be interested in frequent deposits of large amounts of cash, often more than one or two thousand dollars, N.T. 44–45, in the account of appellant as a Food Services Division senior executive, lower court's opinion at 4, who had a key position[7] and whose gross annual pay from

6. The emphasized phrase makes clear that the falsification does not actually have to have affected the outcome; it is enough if it potentially did. The comment to the Crimes Code agrees. Toll, *Pennsylvania Crimes Code Annotated*, at 544 (1974).

7. Appellant's supervisor described appellant's duties as:
 [W]riting specifications for new products, and in reviewing specifications, that sort of thing. Two, he was involved in surveying the

the School District was $13,288.34, N.T. 93. The proximity in time of the Shane Meat Company contract and the $2,500 deposit, which was one percent of the contract, was, justifiably, of interest to the grand jury. We have no difficulty in holding that a false answer to the question regarding the source of the deposit was material in that it could have kept from the grand jury evidence of a kickback, or could have diverted the investigators' attention from other Shane Meat Company transactions. In any event, the answer affected the course of the investigation in that it stopped the grand jury from questioning further to reach the truth, whatever the truth was, as it otherwise would undoubtedly have done. It is unrealistic to say, as appellant does, that after the elaborate explanation that appellant gave the grand jury about the source of the deposit, the jury was "not hindered" in asking appellant, *de novo* as it were, "Was the cash deposit on September 3, 1974, the result of an illegal payment by a food broker?" Brief for appellant at 37 (footnote omitted).

–5–

Appellant next argues that the evidence leading to his conviction was insufficient because the Commonwealth failed to prove that he lied wilfully.

 The wilfulness of a defendant's false statement can— indeed, often must—be proved by circumstantial evidence. *United States v. Chapin*, 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *United States v. Devitt*, 599 F.2d 135 (7th Cir. 1974),

school locations that were about to begin new lunch programs or breakfast programs; three, he was acting in a liason [*sic*] capacity between the Food Services Division and the Purchasing Division.
\* \* \* \* \* \*
Q. With whom would [appellant] come into contact in performing his liason [*sic*] duties?
A. [Appellant] would contact various members of the Purchasing Division, and in addition to suppliers on certain occasions involving delivery, or new product specifications and this sort of thing.

*cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975). Here, appellant argues that the grand jury testimony introduced at trial showed that he was confused about his finances and that he protested he couldn't keep track of every penny he had deposited a year before. N.T. at 74. On the contrary, the testimony shows that at least he was clear on the issue of his lottery win. On November 6, 1975, when appellant was first asked to explain the source of a number of bank deposits, he said he could not remember. He was given time to check his records, and on November 17, 1975, the testimony went this way:

Q. And it is my understanding of a meeting that took place between [the parties, lawyers and the judge supervising the grand jury] that you are now waiving your Fifth Amendment rights now to testify concerning these records and those deposits, and you're now willing to testifying concerning these deposits; is that correct?

A. That is correct.

Q. Did you bring any records with you to refer to during the course of your testimony?

A. Well, I referred to the dates that you gave me and the other records. You would have my bank deposits to verify anything.

Q. Very well. And the first deposit of cash that we were interested in was September 3, 1974. Your bank records show a deposit of twenty-five hundred dollars.

A. Well, I'm unable to determine whether that was all cash or whether there was cash and/or checks involved. However, in the first of November, as I stated in the judge's chambers, I hit a number.

Q. The first of November?

A. The first of September.

Q. You hit a number?

A. I hit a number. I had sixteen dollars on the number. I hit a number for sixty-four hundred dollars.

Q. On September 1st?

A. Around the 1st of September.[8]

Appellant argues that because his story could easily have been proved false, it was improbable that he was wilfully lying. As the Commonwealth notes: "Men who are caught up in lies, however, often act with foolish desperation . . ." Brief for Commonwealth at 31.

 The incident of the Lucky 13 card also serves to indicate wilfulness. Appellant concentrates his arguments on the fact that the card contained no information that could have been of use to appellant. This fails to refute the implication that nonetheless, he was looking for a "way out," and had merely picked one way that turned out to be unhelpful.

–6–

 Appellant next argues that it was error for the lower court to allow a reference to the fact that appellant's duties were changed as the result of a departmental investigation. Appellant argues that this was unduly prejudicial, as evidence of prior wrongdoing. This is the testimony, by Kenneth Clickenger, Director of the Food Services Division:

Q. During the time that you knew [appellant] and he was connected with the School Food Services Division, did his duties change?

A. Yes, they did.

Q. When was that, sir?

A. It was toward the end of March of 1975.

Q. What was the reason for that change?

A. The reason was that the School District itself had its own internal investigation through the internal Controller's Office in the Legal Division.

MR. MORRISON [appellant's attorney]: I am going to object to any further answers to questions indicating another crime, sir.

8. A passage quoted by appellant in his brief came later in the questioning when appellant appears to have gotten rattled; it pertains to other deposits in October and November.

N.T. at 96–97.

In its opinion the lower court held to its position that the evidence was admissible because "it helped to establish the materiality of the defendant's perjured testimony. Second, it was in direct response to defense counsel's cross-examination of an earlier witness as to the alleged absence of evidence of corruption uncovered by the grand jury." Lower court's opinion at 7.

We agree that to some extent, the testimony added to the materiality of the perjury; by showing that appellant's job was the focus of a departmental probe, it pointed up the importance of his testimony to the grand jury. We also agree with the second reason given by the lower court for admitting the evidence. Thus, we conclude that the evidence was not, in itself, irrelevant. The question then becomes: Can we assume that the trial judge kept the evidence "compartmentalized" for the purposes for which it was admitted, without allowing it to affect his attitude toward appellant on the broad issue of guilt or innocence?

We set out the framework for this inquiry, as regards a nonjury trial, in *Commonwealth v. Conti*, 236 Pa.Super. 488, 345 A.2d 238 (1975). There the trial judge recognized that the evidence at issue was inadmissible, but the same question was posed as here—whether he could "compartmentalize" it in his mind and not let it affect his other findings. We said two factors are critical:

> One factor will be the inherently prejudicial quality of the specific evidence involved. . . . [W]hen the risk is not of emotional impact but rather of intellectual error in tracing a chain of inferences or in recognizing the pitfalls of double hearsay, greater weight will be given to judicial expertise. . . . The other factor will be the importance of the evidence to the particular case.

236 Pa.Super. at 501, 345 A.2d at 245.

Here, we find that not only was the evidence not highly emotional, but it did not amount to evidence of a prior crime. Appellant's "loss of authority" might have been the result simply of mismanagement; it was appellant's counsel

who referred to it as the result of a "crime". N.T. at 97. Furthermore, the evidence was not of importance to the case; for as discussed above, there was sufficient other evidence on which to base a finding of perjury.

–7–

 We now reach appellant's final argument, which is that his perjury conviction, which we have so far held valid for the reasons stated above, should be reversed because of irregularities in the convening of the grand jury.

Appellant argues that the petition filed by the district attorney was irregular in several respects: it lacked factual averments of the requisite one or more cognate offenses that must be found before a general investigation may be begun; it lacked reasons why the ordinary processes of law enforcement were inadequate; and it only tended to dramatize mismanagement within the Food Services Division, instead of focusing on crimes. *See Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764, *cert. denied*, 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552 (1971); *Special Grand Jury Case*, 397 Pa. 254, 154 A.2d 592 (1959); *McNair's Petition*, 324 Pa. 48, 187 A. 498 (1936); *Grand Jury Investigation of Western State Penitentiary*, 173 Pa.Super. 197, 96 A.2d 189 (1953). We do not need to consider this argument, however, for we hold that appellant is barred from challenging the legality of the grand jury at this time.

There are two main cases to consider: *Commonwealth v. Schindler*, 170 Pa.Super. 337, 86 A.2d 151 (1952), and *Commonwealth v. McCloskey, supra.*

In *Schindler*, a conviction for perjury before a grand jury was challenged on appeal, as here, by the argument that the district attorney's petition that brought it into being was defective. This court held, however:

Where the court has general jurisdiction of the subject matter of the proceeding it has jurisdiction to take testimony therein. Its jurisdiction is not defeated or ousted by defects in the pleadings, process or procedure in limine whereby the proceeding is instituted . . ..

170 Pa.Super. at 340, 86 A.2d 151, 152.

Similarly, here the lower court had jurisdiction over the crimes specified in the district attorney's petition: theft by deception, endangering the welfare of children, bribery, solicitation to commit bribery, and misapplication of public funds. As a further ground for decision, this court said in *Schindler*:

> The investigation may have been voidable, but certainly not void, and appellant raised no objections to the legal competency of the grand jury when he was called before it, and testified without protest.

170 Pa.Super. at 341, 86 A.2d 151, 152.

Appellant argues, however, that *Schindler* has been overruled by *McCloskey*. At issue in *McCloskey* were convictions growing out of evidence uncovered by an investigating grand jury. The Supreme Court held that the fifth amendment's protection against self-incrimination and the sixth amendment's right to counsel require that prior to an appearance before the grand jury, the court must instruct a witness of his right to consult counsel before and after the appearance, and of his right to appear before the court with counsel to obtain a ruling as to whether he may properly refuse to answer a given question. The Court also said, however:

> A convicted defendant who believes he has been aggrieved by any illegal actions of the investigating grand jury could obtain appropriate appellate review in his appeal from judgment of sentence.

443 Pa. at 135, 277 A.2d at 773.

Since this language is general, and since *McCloskey* dealt only with violations of a witness's constitutional rights, the question is, How broad did the Court mean its statement to be?

Initially, we may define three categories of convictions arising from appearances before a grand jury: first, a conviction based on evidence uncovered by a grand jury, where the witness's constitutional rights were violated, as in *McCloskey*; second, a conviction based on evidence uncov-

ered by the grand jury, where there was no violation of the witness's *constitutional* rights although an illegality was involved; and third, a conviction of perjury based on false testimony before the grand jury. *McCloskey* makes it clear that for the first category, illegalities in the conduct of the grand jury may be raised on appeal from the resulting conviction. Also, it is arguable that the broad language of *McCloskey* overruled *Schindler* as to a defendant in the second category as well. For example, a witness who suspects that the grand jury may be on a "fishing expedition" but who, out of a willingness to cooperate or out of a trust in the legal system, testifies and incriminates himself, may find an avenue for relief in *McCloskey*; whether this is so we specifically do not decide for the question is not before us. We do hold, however, that as to a witness who perjures himself before the grand jury, *McCloskey* offers no relief.

This distinction is supported by strong considerations of policy; perjury undermines the judicial system in a unique way. *See United States v. Williams*, 341 U.S. 58, 68, 71 S.Ct. 595, 95 L.Ed. 747 (1951). In *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), the Supreme Court considered an appeal by a grand jury witness who was convicted of perjury. He argued that he had not received *Miranda* -type warnings before he appeared before the grand jury and that without knowing of his right to remain silent, he was caught, as it were, in a vise, since he could only perjure himself or incriminate himself. He perjured himself. The Court was divided on the question of the witness's right to *Miranda* -type warnings, but it was unanimous in holding that a witness who perjures himself rather than incriminate himself gets no protection. The four-justice plurality quoted with approval a prior Court of Appeals case:

> [A grand jury witness] might answer truthfully and thereafter assert the constitutional guaranty. Under no circumstances, however, could he commit perjury and successfully claim that the Constitution afforded him protection from prosecution for that crime.

*United States v. Orta,* 253 F.2d 312 (5th Cir. 1958).

Mr. Justice BRENNAN, concurring in the judgment, wrote:

Although the Fifth Amendment guaranteed respondent the right to refuse to answer the potentially incriminating questions put to him before the grand jury, in answering falsely he took "a course that the Fifth Amendment gave him no privilege to take." *United States v. Knox,* 396 U.S. 77, 82, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969). "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969) (footnote omitted).

425 U.S. at 584–85, 96 S.Ct. at 1780.

Mr. Justice STEWART, also concurring in the judgment, wrote:

The Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury.

425 U.S. at 609, 96 S.Ct. at 1792.

Two concurring justices (eight Justices voted; Mr. Justice STEVENS took no part in the decision) indicated that they might have granted the witness relief if the conviction had resulted from "governmental tactics or procedures so inherently unfair under all the circumstances as to constitute a prosecution for perjury a violation of the Due Process Clause . . . ." 425 U.S. at 585, 96 S.Ct. at 1780 (Mr. Justice BRENNAN, concurring in the judgment). The other two concurring justices spoke similarly of "prosecutorial conduct amounting to a denial of due process . . . ." 425 U.S. at 609, 96 S.Ct. at 1792 (Mr. Justice STEWART, concurring in the judgment) (footnote omitted). However, there is no allegation of such misconduct here.

Affirmed.

HOFFMAN and CERCONE, JJ., concur in the result.

WATKINS, former President Judge, and VAN der VOORT, J., did not participate in the consideration or decision of this case.