401 A.2d 312

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Patrick DRISCOLL, Appellant.**

Supreme Court of Pennsylvania.

Argued March 13, 1979.

Decided May 1, 1979.

Leonard I. Sharon, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Robert L. Eberhardt, Charles W. Johns, Asst. Dist. Attys., for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO and LARSEN, JJ.

## OPINION

MANDERINO, Justice.

Appellant, Patrick Driscoll, was charged with possession, possession with intent to deliver, and delivery of a controlled substance in violation of the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. §§ 780–116, 780–130. Pre-trial motions were denied, and he was brought to trial before a judge and jury. A mistrial was declared because of the jury's inability to reach a verdict. In appellant's second trial, a jury found him guilty on all three counts. Post-verdict motions were denied, and sentence of three years probation was imposed.

Appellant then appealed to the Superior Court which affirmed (Hoffman, J., dissenting). We granted appellant's petition for allowance of appeal and this appeal followed.

Initially, appellant argues that the prosecution has failed to establish all essential elements of the crime charged. We agree.

The prosecution's evidence at trial established that on the evening of December 17, 1974, Detective James Ramsey of the Pittsburgh, Pennsylvania Police Department, was introduced to appellant by an informant with whom Ramsey had been working. This introduction came about after the informant took Ramsey to appellant's room in a Point Park College dormitory. Ramsey testified that he purchased approximately 1,000 capsules, purported to be amphetamine, from appellant for $200.00. A criminologist's analysis was entered into evidence on stipulation of both counsel. The criminologist's report stated that there were 979 capsules; that tests were performed on a randomly selected sample of those capsules; and that the tests disclosed the presence of amphetamine and caffeine. The report did not specify the number of capsules actually analyzed, nor did it state *the amount of* amphetamine found to be present in those capsules analyzed.

Appellant contends that the prosecution's evidence is insufficient to sustain a conviction because although the evidence establishes that appellant possessed amphetamine, that alone is not a crime. According to appellant the prosecution must present (1) evidence of the *quantity* of amphetamine possessed; and (2) evidence that the quantity possessed *has a potential for abuse.* The prosecution in this case concedes that it did not present evidence as to the quantity of amphetamine possessed nor did it present evidence of what quantity of amphetamine has a potential for abuse. The prosecution, however, contends that the law does not require it to prove the quantity possessed by appellant or the quantity which has a potential for abuse. Our examination of the statutory scheme of the Act and of the statutory language compels us to reject the prosecution's view.

The statutory scheme of the Act divides controlled substances into five different categories. These five categories are designated in the Act as "Schedules" and are numbered as Schedule I through Schedule V. Appellant was convicted of violating subsection iii of Schedule II. That subsection

read in conjunction with other parts of the Act makes it a crime to possess with intent to deliver, or deliver:

". . . any material, compound, mixture or preparation *which contains any quantity of the following substances, having a potential for abuse associated with the stimulant effect on the central nervous system:*

1. *Amphetamine,* its salts, optical isomers, and salts of its optical isomers.

2. Phenmetramine and its salts.

3. Methylphenidate.

4. Any substance which contains any quantity of methamphetamine including its salts, isomers and salts of isomers.

(Emphasis added.)

35 P.S. § 780–104(2)(iii).

Appellant claims that the language emphasized in the above quoted portion of the Act requires the prosecution to prove that the *quantity* of amphetamine which appellant allegedly possessed and delivered was sufficient to have ". . . a potential for abuse associated with the stimulant effect on the central nervous system."

The prosecution counters by urging that the phrase ". . . having a potential for abuse associated with the stimulant effect on the central nervous system," modifies the preceding word, "substance," not the word "quantity," so that this portion of the Act should be interpreted to mean that proof of possession or delivery of *any quantity* of amphetamine is sufficient to sustain a conviction.

The question presented is one of first impression for this Court. The Superior Court, however, addressed a similar problem in *Commonwealth v. Teada,* 235 Pa.Super. 438, 344 A.2d 682 (1975). In that case, the Superior Court was called upon to interpret identical language which appears in Schedule III of the Act rather than Schedule II which is now before us. Schedule II is concerned with substances that *stimulate* the central nervous system while Schedule III is

concerned with substances that *depress* the central nervous system. Otherwise, the significant language is identical.

Schedule III provides:

"(i) Any material, compound, mixture, or preparation . . . *which contains any quantity of the following substances having a potential for abuse associated with a depressant effect on the central nervous system:*

1. Any substance which contains any quantity of a derivative of barbituric acid, or any salt of a derivative of barbituric acid.

2. Chorhexadol.

3. Glutethimide.

4. Lysergic acid.

5. Lysergic acid amide.

6. Methyprylon.

7. *Phencyclidine.*

8. Sulfondiethylmethane.

9. Sulfonethylmethane.

10. Sulfonmethane.

(Emphasis added.)

35 P.S. § 780–104(3)(i).

The defendant in *Commonwealth v. Teada,* 235 Pa.Super. 438, 344 A.2d 682 (1975) was charged with selling phencyclidine (No. 7 above) to a police undercover agent. At trial, the prosecution established that the substance sold to the agent contained a quantity of phencyclidine, however, the prosecution did not establish the amount of phencyclidine contained in the substance sold. Furthermore, the prosecution presented no evidence in *Teada* that the quantity of phencyclidine contained in the substance sold to the agent would have ". . . a potential for abuse associated with a depressant effect on the central nervous system."

The *Teada* court held that the Act manifested a legislative intent to proscribe the possession and delivery of certain substances only if they were present in sufficient quantity to have a depressant effect on the central nervous system. If not shown to have been present in such quantities, posses-

sion or delivery of such substances was not criminal under the Act. Our grant of appellant's petition for allowance of appeal in the instant case was based, in part, upon the apparent conflict between *Teada* and the result reached by the Superior Court in this case.

 Our purpose in this case, as it is in any case requiring interpretation of a statute, is to give effect to the intent of the legislature. To determine that intent we look both to the statutory scheme, and to the specific language of the Act. We must assume that the legislature intends every word of the statute to have effect. See, the Statutory Construction Act of 1972, Pa.C.S.A. § 1922(2) (Supp. 1978–79).

The Act authorizes the Secretary of Health of the Commonwealth to control certain substances listed in Schedules I through V. An examination of Schedules I through V reveals that Schedule I is concerned with the most dangerous controlled substances and each succeeding Schedule is concerned with progressively less dangerous controlled substances. Each Schedule in turn has various subsections. The Schedule II with which we are concerned contains four subsections. The first two subsections control certain substances such as opium, coca leaves and certain derivatives. In these two subsections there is no reference to *quantity* nor does the language *having a potential for abuse* appear. These terms appear however in subsection iii, the subsection under which appellant was convicted. (Subsection IV is definitional and not relevant here) These terms also appear in the relevant subsection of Schedule III which was before the Superior Court in *Teada, supra.*

The prosecution attempts to distinguish the result in *Teada* with that of the trial court in the case before us. The prosecution argues that in *Teada* the court was concerned with the substance, *phencyclidine,* which is controlled under Schedule III. Since the statutory scheme is such that fewer restrictions may be imposed upon the latter sections and since the substance which we are concerned with, *amphetamine,* is a Schedule II substance, the prosecution argues that the analysis of *Teada* is inapplicable.

■ This reasoning is deceptively simple and we must reject it for two reasons. First, notwithstanding the fact that *Teada* concerned a Schedule III substance and this case involves a Schedule II substance, the language of the two phrases which we must interpret is identical and different interpretations cannot rationally be applied to identical language even though the phrase appears in the two different Schedules. Secondly, both Schedule II and Schedule III are divided into subsections. Some of the subsections in both Schedules clearly state that "any" amount of a listed substance is prohibited. The other subsections of both Schedules contain the language in question—"any quantity . . having a potential for abuse." To follow the prosecution's rationale would be to recognize that the legislature had a distinct purpose in dividing Schedule III into subsections and at the same time conclude that there was no reason to subdivide Schedule II. We cannot so conclude. The obvious intent of the legislature in establishing subsection iii in Schedule II was not to prohibit the possession or delivery of amphetamines in *any* amount, as those substances in subsections i and ii are prohibited. Rather, the intent was to prohibit the possession or delivery of amphetamines containing a sufficient quantity having a potential for abuse.

■ To interpret the phrase ". . . which contains any quantity of the following substances, <u>having a potential for abuse associated with the stimulant effect on the central nervous system</u>" with the underlined portion modifying "substance" and not "quantity" actually reduces the underlined portion to surplusage. In order to give meaning to the words, as we are required to do, we must interpret them as modifying "quantity."

■ This interpretation is consistent with the legislative mandate that courts are to strictly construe penal statutes, and that any ambiguity contained in such acts must be interpreted in favor of the accused and against the prosecution. Statutory Construction Act of 1972, 1 Pa.C. S.A. § 1928(b)(1) (Supp. 1978–79). The wording of the Act clearly demonstrates the legislative intent to require proof,

with regard to certain substances, that they were present in sufficient quantity to have an effect upon the central nervous system (Schedule II a stimulant effect; Schedule III a depressant effect) before their possession or delivery becomes criminal. Possession or delivery of other substances, more dangerous in the legislature's judgment, is prohibited regardless of amount. Amphetamine is one of those substances which the legislature chose to prohibit only if a quantity was possessed or delivered which has a potential for abuse.

██ In its opinion denying appellant's post-verdict motions, the trial court concluded that the prosecution had sustained its burden even under the statutory construction required by *Teada*. The trial court said:

> "It can be concluded beyond all doubt that nine hundred and seventy-nine amphetamine capsules, no matter what their strength, collectively ingested, would have a potential to act as a stimulant on the nervous system."

We must respect the trial court's reasoning as dangerously simplistic. First of all, we are dealing with a criminal statute and as previously pointed out, they are to be strictly construed in favor of the accused. Secondly, the ingestion of 979 of *anything*—doughnuts, watermelons, or chocolate bars, has a potential for abuse. To give to the statute the trial court's meaning would be proper for those substances in the Act which are outlawed regardless of quantity or the substance's potential for abuse. To accept that interpretation as to amphetamine is to ignore the statutory scheme and the modifying language of subsection iii of Schedule II. Moreover, there are controlled substances covered by the Act which may be possessed in minimal quantities although outlawed in larger quantities. Minimal amounts of codeine contained in a cough medicine may be purchased and possessed without a prescription. Larger quantities of codeine cannot. There is no basis in the Act for concluding that the legislature intended an addition of the 979 capsules. The language used by the legislature is "*any material, compound, mixture, or preparation* which contains any quantity of the

following substances having a potential for abuse." The legislature did not use the word capsule but interpreting as we are a criminal statute, any doubt concerning the language used must be resolved against the prosecution. Certain everyday foods contain traces of controlled substances yet each item individually is not dangerous.

The prosecution has also argued that appellant's counsel, by stipulating to the content of the crime laboratory report, misled the prosecution on the issue of sufficient quantity under the applicable statute. The stipulations consisted of these words by appellant's counsel:

"I will stipulate if Dorothy Toth were called to testify, the criminalist, she would testify that the substance was checked and it was amphetamines which I believe is controlled under Schedule 2 (iii) 1."

The stipulation is only the usual one that dispenses with the necessity to physically present a witness in the courtroom. Appellant's attorney did not stipulate as to quantity or the quantity necessary for abuse, or as to the necessary elements of the crime, but only that the substance itself was amphetamine. We fail to find the stipulation misleading. Appellant has raised the issue of quantity sufficient to have a potential for abuse at each stage of the proceedings and the judgment of sentence must now be reversed. Because the prosecution has failed to establish all the material elements necessary under subsection iii of Schedule II, the conviction cannot stand.

Additionally, appellant has raised the following issues which we need not consider: (1) the prosecution failed to prove that appellant was not registered under the Act to possess amphetamine; (2) since the jury was charged that the prosecution has the burden of proving that appellant was not licensed the verdict is contrary to the law as set forth in the charge; (3) the indictment should have been quashed due to inordinate delay in arrest; and (4) the prosecution should have supplied appellant with the name of a government intermediary involved in the sale.

Judgment of sentence reversed and appellant ordered discharged.

EAGEN, C. J., filed a concurring opinion in which NIX and LARSEN, JJ., joined.

EAGEN, Chief Justice, concurring.

The Commonwealth failed to establish what quantity of the amphetamines was sufficient to have ". . . a potential for abuse associated with the stimulant effect on the central nervous system." Nor did the Commonwealth establish the quantity of amphetamine each capsule of those analyzed possessed.

For these reasons, I agree the conviction and judgment of sentence may not stand.

NIX and LARSEN, JJ., join in this opinion.