UNITED STATES of America, Appellee,

v.

Eric PICKLESIMER, Appellant.

UNITED STATES of America, Appellee,

v.

Emanuel VOLINO, Appellant.

UNITED STATES of America, Appellee,

v.

Jeffrey BUCKLEY, Appellant.

Nos. 78–1253, 78–1287 and 78–1288.

United States Court of Appeals,
Third Circuit.

Argued Sept. 8, 1978.

Decided Nov. 2, 1978.

James J. West, Asst. U. S. Atty., Pittsburgh, Pa., for appellee.

Charles F. Scarlata, Pittsburgh, Pa., for appellant Picklesimer.

Michael D. Berlin, Pittsburgh, Pa., for appellant Volino.

Maury D. Nusbaum, Pittsburgh, Pa., for appellant Buckley.

Before ALDISERT and HIGGINBOTHAM, Circuit Judges, and STERN, District Judge *.

## OPINION

STERN, District Judge.

Defendants Picklesimer, Volino and Buckley appeal their convictions for conspiracy to possess with intent to distribute phencyclidine (PSP), a drug enumerated in Schedule III of the Controlled Substances Act of 1970, 21 U.S.C. §§ 801 et seq. (1972), in violation of 21 U.S.C. § 846, and for possession of this same drug with intent to distribute, in violation of 21 U.S.C. § 841. All three defendants urge this Court to construe Schedule III of 21 U.S.C. § 812 to require the government to prove possession of a sufficient quantity of the drug to have a depressant effect upon the central nervous system. For reasons we discuss at greater length, we decline to adopt defendants' construction of the statute as contrary to the clear intention of Congress, and we join the Courts of Appeals for the Fifth and the Seventh Circuits in holding that any quantity of the substances enumerated in Schedule III is proscribed by the statute.

Defendants raise other challenges to their convictions. All three defendants challenge the admission into evidence of testimony that a gun was found in the vehicle which transported the PSP tablets. Defendants Buckley and Volino also claim that the evidence was insufficient to support their conviction for constructive possession of the PSP tablets, and they claim that the district court improperly denied their motions to dismiss the indictment based on the pendency of state firearms charges against them. We find these contentions to be without merit and we affirm defendants' convictions in all respects.

### I.

Commencing October 17, 1977, defendants Picklesimer, Volino and Buckley, separately represented and having waived their right to trial by jury, were tried before the Honorable William W. Knox. The facts as they emerged at trial are as follows.

On the evening of January 23, 1977, Officer Edward Williams of the Drug Enforcement Joint Narcotics Task Force was taken by an informant to the home of Eric Picklesimer (Tr. 7–8) where Picklesimer furnished him samples of marijuana and PSP. (Tr. 9–12). The following day, the informant arranged for Williams to purchase from Picklesimer 50,000 tablets of PSP for $25,000. The purchase was scheduled to take place that evening at the parking lot of Traveler's Paradise Bar on Route 30 in Finley Township. (Tr. 12–13).

Surveillance having been pre-arranged, Williams and the informant went to the parking lot as planned. Picklesimer arrived several minutes later in a red Dodge. He entered Williams' vehicle, demanded the money, and told Williams that the "stuff" would arrive shortly in another vehicle. Several minutes later Volino and Buckley

---

* Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

drove up in a van. Picklesimer again demanded the money and Williams went to the trunk of his car. (Tr. 15–17).

This was the signal for the surveillance agents. Detective Duffy and Sergeant Miles approached the van on foot. Volino attempted to flee, but Detective Sharpie and Agent Sorace blocked his van with their car. (Tr. 29–30). At this point, Buckley, who was seated on the passenger side of the van, reached toward his feet. When the officers finally entered the van, they discovered a .45 caliber, fully loaded, on the floor where Buckley had been seated; a loaded .38 caliber was found on the floor by Volino's seat. When Buckley was searched, the police found extra clips for his gun in Buckley's shirt pocket. (Tr. 30–38). In the rear of the van, behind the driver's seat, the police found a total of 59,000 tablets of a drug, later identified as PSP. (Tr. 38–39; 52). Defendants were apprehended and arrested.

At the time of their arrest, Buckley and Volino were also charged with possession of firearms and drugs in violation of the laws of Pennsylvania. One week later both of these charges were dismissed. However, *following* the federal drug indictment, the state authorities revived the firearms, but not the drug, charges. (Mem. Order Denying Motion to Dismiss). Buckley and Volino moved pre-trial to dismiss the indictment based on the pendency of state firearms charges arising out of the same occurrence. The motion was denied.

Judge Knox found all three defendants guilty on both counts. Volino and Buckley were sentenced concurrently on both counts to three years followed by a special parole term of three years. Picklesimer received concurrent sentences of two years followed by a special parole term of two years.

## II.

■ Defendants raise an interesting interpretation of the Controlled Substances Act of 1970, 21 U.S.C. §§ 801, *et seq.*[1] They claim that the substances enumerated in Schedule III of the Act, 21 U.S.C. § 812, are not proscribed unless they are possessed in sufficient quantity to have a depressant effect on the central nervous system.[2] In support of this interpretation, defendants argue that the phrase "having a depressant effect on the central nervous system" modifies the phrase "any quantity":

> (b) Unless specifically excepted, or unless listed in another schedule, any material, compound, mixture, or preparation which contains *any quantity* of the following substances *having a depressant effect on the central nervous system* :
>
> . . . . .
>
> (7) Phencyclidine.

(Emphasis supplied). We find this argument unpersuasive.

Schedule III has been construed by two other Courts of Appeals and one state court has construed identical language in a state statute. In *United States v. Nickles,* 509 F.2d 810 (5th Cir. 1975), defendant advanced an argument related but not identical to that which defendants advance here: he argued that the government was required to provide that PSP *in fact* has a depressant effect on the central nervous system.[3] The Fifth Circuit summarily rejected this argument:

---

1. The Controlled Substances Act of 1970, 21 U.S.C. §§ 801, *et seq.*, sets forth at § 812 five separate schedules of controlled substances. Section 841 makes it a crime to manufacture, distribute or dispense any of these substances, the gravity of punishment depending upon the schedule to which the drug in question belongs. Section 846 makes it a crime to conspire to commit any of the acts proscribed by Section 841.

2. It seems clear that the expert witness who identified the drug did not so testify. Mr. Pad-

den of the Allegheny County Crime Laboratory testified only that on examination of the pills he found that they contained PSP (Tr. 51).

3. This argument is different from that advanced here. The defendants *sub judice* argue that in each case the government must prove a sufficient quantity of the drug to have a depressant effect on the central nervous system; the *Nickles* defendants argued that the government must prove that PSP *in fact* has such an effect upon the central nervous system.

We think the phrasing of the statute clearly evinces a Congressional determination of the actual depressant effect of the specifically listed substances, including phencyclidine.

*Id.*, at 811.

In *United States v. White*, 560 F.2d 787 (7th Cir. 1977), the argument presented in *Nickles* was advanced as to amphetamines: the defendants argued that the government must prove that the particular amphetamine found in the defendant's possession in fact has a stimulant effect on the central nervous system.[4] The Seventh Circuit rejected this argument, noting that "every substance listed appears generically" and, therefore, that the language in question was not superfluous. *Id.*, at 789.[5]

Defendants rely on *Commonwealth v. Teada*, 235 Pa.Super. 438, 344 A.2d 682 (1975), which, over two strong dissents, adopted the precise construction they advance here with respect to a state statute, 35 P.S. § 780–113(a)(30), with language identical to 21 U.S.C. § 812. The court there looked to the state statute as a whole and concluded that "the intent of the legislature is to prohibit possession . . . of compounds containing a quantity of the enumerated substance that is sufficient to be potentially abused by use as a depressant of the central nervous system . . . " *Id.*, at 443–444, 344 A.2d at 684. It reasoned that the substances set forth in the first two schedules were intended to be proscribed in any quantity because of their high potential for abuse, but that "greater proof requirements [are imposed] on the prosecution as the criminal inquiry moves from the most dangerous substances to the least dangerous ones." *Id.*, at 442–443, 344 A.2d at 684. It further reasoned that the phrase "having a depressant effect on the central nervous system" would be superfluous were defendants' interpretation not adopted and it raised the possibility that, it if held otherwise, then "the sale, delivery or possession of many non-prescription drugs such as aspirin, anacin, some cough syrups, etc., could be the subject of criminal prosecution if they contained even minute quantities of some of the substances enumerated in Schedule III . . . ." *Id.*, at 444, 344 A.2d at 685.

We agree with the Courts of Appeals for the Fifth and Seventh Circuits, and we disagree with the Superior Court of Pennsylvania as to the proper interpretation of the language in question.[6] We reach this result by examining the statutory purpose and scheme of the Controlled Substances Act and the particular language in question.

The purpose of the Controlled Substances Act of 1970 was to control the illegal manufacture and distribution of substances which, while they may have legitimate medical purposes, are subject to abuse and have a "substantial and detrimental effect on the health and general welfare of the American people." 21 U.S. § 801(2) (Congressional findings and declarations). *See also*, H.Rep.No. 1444, 91st Cong., 2nd Sess. (1970), *reprinted in* 3 U.S.Code & Admin. News, pp. 4601, 4566 (1970). Towards that end, Congress divided the controlled substances into five categories, ranging from Schedule I substances, which have no medi-

---

**4.** Amphetamines are also included in Schedule III. The language at issue in *White*, analogous to that at issue here, was as follows:

> (a) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains *any quantity* of the following substances *having a stimulant effect on the central nervous system*:
> (1) Amphetamine, its salts, optical isomers, and salts of its optical isomers.

21 U.S.C. § 812. (Emphasis supplied).

**5.** The Seventh Circuit also relied on the definitional portion of the Act, specifically, 21 U.S.C. § 802(9), which defines a "depressant" as "any quantity of a substance which the Attorney General has found to have . . . a potential for abuse because of its depressant . . effect on the central nervous system." *Id.*, at 790. However, as the court there noted, this provision is not directly applicable to Schedule III.

**6.** Of course, we in no way intimate that *Teada* was an incorrect interpretation of the Pennsylvania statute. The courts of Pennsylvania are perfectly free to construe their own statutes in a manner which they believe to be consistent with the intention of their legislature.

cal use and are subject to serious abuse, to Schedule V substances, which do have a medical use and are less susceptible of abuse. The Act further gives the Attorney General the right to revise these schedules—by deletion, revision or transfer among schedules—upon recommendation of the Secretary of Health, Education and Welfare and upon consideration of eight enumerated criteria set forth at 21 U.S.C. § 811.[7]

Defendants argue that not to adopt their construction would render superfluous the phrase "having a depressant effect on the central nervous system;" that the only possible purpose of this phrase is to modify the phrase "any quantity." However, closer scrutiny reveals that this language would not be superfluous.

Each of the five schedules enumerates a number of drugs. Preceding the list there is a general description of the drugs which are listed.[8] Thus, for example, Schedule I refers to "any of the following opiates", "any of the following opium derivatives", and "any of the following hallucinogenic substances." Schedule II refers to "any of the following opiates"; Schedule V to "any of the following limited quantities of narcotic drugs."

Viewed in the context of the discretion afforded the Attorney General to revise the Schedules, it seems clear that these descriptions were intended to provide guidance to the Attorney General so that where, for example, a new drug is introduced into the market, it can be placed in the same schedule as a drug with similar effects. Thus, any drug "having a depressant effect on the central nervous system" will be placed in Schedule III, just as an "hallucinogenic sub-

stance" will be placed in Schedule I. Viewed in this context, there is nothing superfluous about the phrase "having a depressant effect on the central nervous system."

We find further support for our conclusion in other provisions of the Act. Viewing the statute as a whole it is clear that where Congress intended the quantity of a substance to be dispositive, it indicated so unequivocally. Thus, for example, a drug such as codeine may be a Schedule III or a Schedule V substance, depending upon its quantity and concentration. Also persuasive in this regard is subsection (d) of § 812 which permits the Attorney General to except any compound from Schedules III, IV or V if he finds either that (1) the compound contains "one or more active ingredients not having a depressant or stimulant effect on the central nervous system;" or (2) there are ingredients in the substance which would vitiate those ingredients which do have a depressant or stimulant effect on the central nervous system. These provisions suggest that Congress recognized that certain substances are less hazardous in limited quantities or that their depressant effect may be vitiated by other ingredients. The corollary to this is that Congress believed that some substances are hazardous in *any quantity*, even in quantities insufficient to have a depressant effect upon the central nervous system.[9] We believe that this was clearly the intention of Congress with respect to the substances enumerated in Schedule III.

Accordingly, we think it clear that Congress did not intend the result urged by the defendants and we reject their construction of the Act.

7. PSP, the drug in question here, was and still is listed among those substances contained in Schedule III. *See* 21 C.F.R. § 1308.13(c) (1977).

8. One of the schedules—Schedule IV—simply lists eleven substances without generic description.

9. Tranquilizers provide such an example. It is clear that Congress regarded them as susceptible to abuse in any quantity. The Senate Report refers to "evidence that improper use of

tranquilizers, *particularly in combination with other chemicals*, such as alcohol, can have particularly harmful consequences." S.Rep.No. 613, at 2, 91st Cong., 1st Sess. (1969). (Emphasis supplied). Thus, it seems clear that Congress regarded some substances as harmful even in amounts which, taken alone, would not have a depressant effect on the central nervous system, for Congress considered the very real possibility that these drugs will be combined with alcohol.

**1204**

### III.

Defendants further contend that the district court improperly admitted into evidence the testimony of Officer Duffy (Tr. 32) regarding the presence of guns in the van which transported the PSP tablets. They rely primarily on *United States v. Bethea*, 143 U.S.App.D.C. 68, 442 F.2d 790 (1971).

In *Bethea*, the government attempted to prove constructive possession of narcotics based on the presence of the defendant in a vehicle containing narcotics. Reversing the conviction for lack of evidence, the court addressed the probative value of testimony regarding the presence of guns in the vehicle:

> While the presence of the three guns in the car may indicate an active association, or even an active association with a common purpose to commit a crime *involving guns*, it does not indicate a joint venture to commit a wrong not involving guns, such as the possession, sale, or concealment of narcotics. Thus, *on the facts of this case*, the Government's theory of a common purpose is without merit.

*Id.*, 143 U.S.App.D.C. at 71, 442 F.2d at 793. (First emphasis in original; second supplied).

██ While this language suggests that the presence of guns may not be probative of a joint narcotics venture, we note that it does not address the question of whether such evidence is *admissible*; that is, whether it may be considered along with other evidence in establishing possession. The court merely considered its weight for purposes of assessing the sufficiency of the evidence against the defendant and concluded that, *under the circumstances of that case*, the entire record, *including* evidence that each defendant had a gun, did not establish a scheme to distribute narcotics. It does not follow from this that such evidence is not relevant. In any event, we believe that where a defendant is charged with narcotics conspiracy, evidence that weapons were found in his possession may be relevant and admissible. It often happens that illegal enterprises, such as narcot-

ic conspiracies, are ongoing ventures, requiring the use of guns for protection of the contraband and in such a case, a weapon may be as much a tool of the crime as the van used to transport the narcotics. It lay within the sound discretion of the district judge to admit evidence concerning possession or use of weapons, and, on the facts of this case, there was no abuse of discretion in the admission of such evidence. *United States v. Wiener*, 534 F.2d 15 (2nd Cir. 1976); *United States v. Pentado*, 463 F.2d 355 (5th Cir.) *cert. denied*, 409 U.S. 1079, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972). To the extent that *Bethea* is inconsistent, we reject it. As for defendants' contention that the evidence was insufficient to support their conviction for possession of the PSP tablets, viewing the evidence in the light most favorable to the government, we find that the evidence was sufficient to support their convictions.

### IV.

Volino and Buckley further contend that the district court erred in denying their motion to dismiss the indictment based on the pendency of state charges against them for the same transaction. As noted earlier, the state charges were dropped *prior* to the federal indictment. Nevertheless, defendants contend that, in indicting them, the government violated the policies set forth in *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1959), and more recently in *Rinaldi v. United States*, 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) whereby the Justice Department will not indict a defendant who has been prosecuted by the state for the same transaction except where necessary to advance compelling interests of federal law enforcement.

██ Here, *Petite* is clearly inapplicable. First, the state charges were dropped *before* the federal indictment. Second, when defendants were again prosecuted by the state—*after* the federal indictment—it was for possession of firearms, an offense clearly distinct from those contained in the federal narcotics indictment. Thus, we find no error whatsoever in the district court's refusal to quash the indictment.

Accordingly, the judgment of the district court will be affirmed.