UNITED STATES of America

v.

TERSELICH, Ivan, Appellant.

No. 88–3687.

United States Court of Appeals, Third Circuit.

Argued March 3, 1989.

Decided Sept. 1, 1989.

As Amended Sept. 18, 1989.

Daniel A. Durkin (Argued), Wilmington, Del., for appellant.

Edmond Falgowski (Argued), Asst. U.S. Atty., Wilmington, Del., for U.S.

Before A. LEON HIGGINBOTHAM, Jr., STAPLETON and COWEN, Circuit Judges.

---

OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr.,
Circuit Judge.

This is an appeal from a judgment of conviction following a jury trial for one count of possession of greater than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy, in violation of 21 U.S.C. § 846. Because the evidence that the defendant, Ivan Terselich ("Terselich"), knew of the presence of the cocaine in the car was insufficient as a matter of law to support his convictions for these offenses, the trial court erred, as a matter of law, when it did not grant Terselich's motion for a judgment of acquittal notwithstanding the jury verdict finding him guilty. Accordingly, we will reverse the judgment on both counts and will remand to the district court for the entry of a judgment of acquittal.

## I.

On February 8, 1988, Terselich was a passenger in a 1982 Ford LTD with Florida license plates that was travelling northbound on Interstate 95 in Delaware. After clocking the car as travelling at 62 miles per hour in a 55 mile an hour zone, Corporal Robert Durnan ("Durnan") of the Delaware State Police pulled the car over for speeding. Joint Appendix ("Jt. App.") at 20 (testimony of Durnan).

After Durnan pulled the car over, he asked Francisca Rosa Velasquez ("Velasquez"), the driver, for her license and registration. Jt. App. at 22. Terselich opened the glove compartment, extracted the registration papers and passed them to Durnan. *Id.* Throughout Durnan's ensuing interviews of the occupants of the car, Durnan concentrated his principal attention on Velasquez, the driver of the car. Durnan asked Velasquez to leave the car and come speak with him in the space between her car and his, where Terselich could not hear her answers. In response to Durnan's questions, Velasquez stated that Terselich was her husband, that the car belonged to a cousin (whom she was unable to name),

and that she was going to Long Island to visit friends for a few days. Jt. App. at 23.

Durnan, who had noticed at this point that Velasquez's name was not that on the registration, *id.* at 23, then went to Terselich and asked him "the same questions" "to see if his story would match her story." Jt. App. at 24, 23. It didn't. Terselich said that he was going to New York on business, not for a vacation, and that Velasquez was not his wife. *Id.* at 24. In addition, Terselich stated that a friend of his named Lopez owned the car, *id.*, an identification that conflicted with both the car's registration to one Javier Perez and with Velasquez's statement that her cousin owned it.

Durnan, who had noted that Velasquez's and Terselich's stories were inconsistent, Jt. App. at 24, then asked Velasquez to come back to his car and to have a seat in it. *Id.* Once there, Durnan spoke with Velasquez at length, inquiring as to whether there was any contraband in the car that she was driving and securing her oral and written consent to search that car. Jt. App. at 25.

Durnan did not ask Terselich's permission to search the car, since Durnan assumed that Terselich had no possessory interest in the car, Jt. App. at 55, nor did Durnan question him further at this time. After asking Terselich to exit from the car, Durnan asked Terselich to wait behind the car while Durnan searched it. Jt. App. at 28. Once Durnan had searched the interior of the car, he wanted to search the trunk. When Durnan asked Velasquez and Terselich for the keys to the trunk, Terselich, who had removed them from the ignition, handed them to Durnan. Jt. App. at 29.

Durnan then searched the trunk. *Id.* In so doing, Durnan discovered that the trunk had a false floor which he correctly suspected concealed a secret compartment. Jt. App. at 58. Durnan suspected that the secret compartment contained drugs, weapons, or money. Jt. App. at 58. Realizing that he would be unable to investigate this compartment further without tools, Durnan handcuffed Terselich and Velasquez

and arrested them. Jt. App. at 30.[1] He then had them and the car separately transported back to Troop 6, a Delaware trooper station. Jt. App. at 31–32. Once there, Durnan discovered that the "secret compartment" was in fact the car's gasoline container. The compartment that the manufacturer had intended to be the car's gasoline tank had been modified by the addition of a trap door and contained nearly sixty pounds of what later proved to be cocaine. Jt. App. at 37–38, 44.

After discovering the cocaine, Durnan went to the Troop 6 cell area, placed Terselich under arrest for possession of the cocaine, and read him his Miranda rights. Jt. App. at 40. Once Terselich had indicated that he understood his Miranda rights, Durnan went to the holding room and placed Velasquez under arrest for possession of the cocaine. He then both read Velasquez her Miranda rights in English and gave her a copy of the Miranda rights in Spanish, which, according to Durnan's testimony, Velasquez appeared to read. Jt. App. at 40. Shortly after initially invoking her Miranda rights, Velasquez asked to speak with William Glanz ("Glanz"), a Drug Enforcement Agency agent whom she had just met when she invoked her Miranda rights and declined to submit to an initial interrogation. Velasquez asked Glanz what was going to happen to her and what was going to happen to Terselich. Glanz told her truthfully that the minimum sentence was ten years for the crime of which she stood charged. Glanz then told

her falsely, *inter alia*, that Terselich was being released because he had told the officers that the cocaine was hers and that she was being paid to drive it north. Velasquez then confessed that she was being paid ten thousand dollars to drive the drugs north. She also stated that she was paying Terselich $5,000 to accompany her, but the district court excluded this statement from evidence under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Terselich and Velasquez were tried together before a jury. At trial, both the cocaine and Velasquez's confession were admitted. Both Terselich and Velasquez were convicted of possession of more than five kilograms of cocaine with intent to distribute and of conspiracy. Because this matter deals with the correct application of legal precedents, our review is plenary. *See Dent v. Cunningham*, 786 F.2d 173, 175 (3d Cir.1986).

## II.

Terselich has raised various challenges to the constitutionality of the police conduct toward himself and toward Velasquez from the point of the initial detention onward. Because we find that, as a matter of law, the evidence presented at his trial was insufficient to support Terselich's convictions, we need not reach either these issues or that of Terselich's standing to raise claims on the behalf of Velasquez.[2] Accordingly, we turn now to considering

---

1. At the time, Durnan would have described his action as placing Terselich and Velasquez under detention under Delaware's two-hour detention statute. The defendant challenged the constitutionality of that statute under the Fourth Amendment to the United States Constitution. However, as discussed below, we found in *Velasquez* that the information based on which Durnan placed Velasquez under detention was sufficient to provide probable cause to arrest her. At 1083. Given that probable cause requires a lesser showing of likelihood of possession or participation in a conspiracy than is required to sustain a judgment of conviction under the reasonable doubt standard, this was equally true of Terselich. Accordingly, the arrest of Terselich was valid irrespective of the claims that the Delaware two-hour detention statute is unconstitutional.

2. In the companion case, *United States v. Velasquez*, 885 F.2d 1076, we addressed as to Velasquez the issues of alleged unconstitutional government conduct raised by Terselich and held: (1) that Velasquez's consent to search was voluntarily given, at 1083; (2) that the information on the basis of which Velasquez was taken into custody was sufficient to give Durnan probable cause to arrest her, hence the unconstitutionality of the two-hour detention statute was irrelevant to the admissibility of the evidence subsequently obtained by Durnan, at 1084, 1087; and (3) that Velasquez voluntarily waived her right to counsel and her right to remain silent, at 1094. Accordingly, we held that the cocaine and Velasquez's confession were properly admitted at trial against her.

the sufficiency of the evidence presented against Terselich.

We review challenges to the sufficiency of the evidence presented at trial by ascertaining whether, viewing the evidence in the light most favorable to the government, a reasonable mind could find the defendant guilty beyond a reasonable doubt of every element of the offense. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The two controlling cases in this circuit applying this test to evaluate the guilt beyond a reasonable doubt of a passenger present at the scene of a drug conspiracy are *United States v. Cooper*, 567 F.2d 252 (3d Cir. 1977); *United States v. Wexler*, 838 F.2d 88 (3d Cir.1988). On the basis of these cases, the evidence against Terselich is insufficient as a matter of law to prove every element of the offenses of which he stands convicted.

In *Cooper*, the defendant, like Terselich, was charged with possession of a large quantity of an illegal drug with intent to distribute it, and with conspiracy. Like Terselich, he had ridden as a passenger in a vehicle in which a large quantity of an illegal drug was concealed. Like Terselich, Cooper had shared driving chores and motel rooms with the driver. *See* 567 F.2d at 254. In addition, three phone calls of an unknown subject matter and by unknown participants had been made between a phone at the residence of a member of the conspiracy and a phone at Cooper's home, and one similar call had been made between the motel room where Cooper and a second member of the conspiracy were staying and the first member's answering service. *Id.* The Court observed that to convict a defendant of conspiracy, there must be some evidence that he entered into an agreement and that he knew that the agreement had the specific unlawful purpose charged in the indictment. 567 F.2d at 253. It went on to note:

> There is no evidence that [Cooper] knew what was in the padlocked rear compartment and no evidence that illegal plans were discussed during telephone calls to his home telephone. The fact that he rode in the truck and shared rooms with

Meador is consistent with a purpose of obtaining inexpensive transportation by sharing driving and expenses. In the absence of *some* evidence that he knew of the contents of the locked compartment or *some* evidence that he engaged in telephone or other communication of a conspiratorial nature, no factfinder could find beyond a reasonable doubt that Cooper was a member of the Allen–Meador conspiracy. The available evidence is perfectly consistent with innocence. There is no evidence suggesting guilty knowledge or participation. One may not be convicted of conspiracy solely for keeping bad company.

567 F.2d at 254–55. The *Cooper* court therefore reversed the district court, holding that it should have granted Cooper a judgment of acquittal. 567 F.2d at 255.

We recently reaffirmed this analysis that "[t]he inferences rising from 'keeping bad company' are not enough to convict a defendant of conspiracy" in *United States v. Wexler*, 838 F.2d 88, 91 (3d Cir.1988). In that case, defendant Wexler had been convicted in a jury trial in the district court of a conspiracy to distribute a large amount of hashish and of aiding and abetting others to do so. *Id.* at 90. Several circumstances were established from which inferences could be drawn that it was "more likely than not" that Wexler "suspected, if not actually knew, that some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated," *id.* at 92: (1) Wexler drove a car in a manner that suggested that he was acting as the "look out" for the truck that was carrying the illegal drugs, (2) he had made a movement consistent with signalling one of the conceded conspirators at one point and had spoken with another at several points throughout the operation, and (3) a fictitiously obtained CB radio was in the car that Wexler was driving when he was arrested. *Id.* at 91. The Court, however, found the inferences that could be drawn from this evidence insufficient:

> What is missing is any evidence that Wexler knew that a controlled substance

was couched behind the doors of the Ryder truck. That knowledge is an essential element of the conspiracy charged. Without it the conviction must fail. As we recently stated, 'there must be evidence tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment."

*Id.* at 91 (citation omitted). Because there was no evidence that Wexler either knew of the drugs or had discussed the conspiracy to transport them with the conspirators in his conversations with them, *id.* at 91, we held that it had not been shown that he had participated in a criminal agreement. Accordingly, there was insufficient evidence to support both Wexler's conspiracy and his aiding and abetting convictions. Accordingly, these convictions were reversed. *Id.* at 92.

In the instant case, there was even less evidence than in *Cooper* or *Wexler* from which the jury could have inferred that Terselich knew of a conspiracy and that its object was to transport the illegal drugs. Like Cooper, Terselich shared driving chores and lodging with the driver of the vehicle carrying the illegal drugs. This is simply, as this Court has put it before, a matter of the company an individual chooses to keep and so no evidence of conspiracy. Sharing travelling expenses on a trip between two major American cities is a normal and usually innocent activity, unlike the situation in *United States v. Leon*, 739 F.2d 885 (3d Cir.1984), where the Court observed that "the crime scene"—a secluded dock in the early hours of the morning shortly after the unloading of twenty tons of marijuana—was "hardly an ordinary one into which an innocent person might wander," *id.* at 892, and so a scene presence within which might give rise to an inference of guilty participation in a conspiracy.

Likewise, although Terselich placed his luggage in the trunk of the car, which was identifiably altered from a purely factory finished interior, these differences did not announce the nature of the contraband carried, if any. Moreover, the method of concealing the cocaine was quite elaborate: the trapdoor, covered by a loose rug, could only be opened by Durnan by prying it open with a crowbar, and in fact only opened without force when an individual shorted across several wires in a device located near the driver's seat in the interior of the car. Thus, as in *Wexler* and *Cooper*, where the fact finder could not infer that the defendant knew what was behind the locked door of the truck for which he served as "look out" or in which he travelled, so here the fact finder could not infer that Terselich knew that the car in which he travelled was transporting a large quantity of cocaine.

The fact that Terselich appeared "nervous" to Durnan when stopped is similarly insufficient to support an inference that Terselich was participating in a conspiracy to transport illegal drugs. Although Terselich is a naturalized United States citizen, he is a permanent resident of Bogota, Colombia. His nervousness may have merely been the normal anxiety of an individual stopped by the police in what is, to him, a foreign country.

Similarly, the fact that Terselich removed the keys from the ignition while Durnan was talking to Velasquez, which Durnan took as an indication that Terselich did not want Durnan to search the trunk, Jt. App. at 28–29, need not have that sinister meaning. Terselich gave the car keys to Durnan immediately upon Durnan's requesting them, and may have removed them initially out of the relatively common adult response to take the car keys with one when one is the last one to exit from a vehicle. But even if a fact finder could infer that an individual who took the keys with him suspected that the trunk contained contraband of some sort, this inference, as we saw in *Wexler*, is too general to serve as evidence that an individual conspired to transport illegal drugs and so cannot support the conspiracy conviction. Finally, there is no evidence that Terselich had contact with anyone other than Velasquez who might have been connected to the alleged conspiracy to have the drugs driven north.

Accordingly, there was insufficient evidence presented at trial that Terselich knowingly participated in a criminal agreement to transport the cocaine to support his conviction for possession of the cocaine with intent to distribute and for participating in a conspiracy to do so. The district court thus erred, as a matter of law, when it did not grant Terselich's motion for a judgment of acquittal notwithstanding the jury verdict finding him guilty.

### III.

For the reasons set forth above, we will reverse the defendant's convictions and will remand for the entry of a judgment of acquittal.