

Opinions of the United
States Court of Appeals
for the Third Circuit

3-1-2004

# USA v. Cartwright

Precedential or Non-Precedential: Precedential

Docket No. 03-1466P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Cartwright" (2004). *2004 Decisions.* Paper 898.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/898

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 03-1466

———————

UNITED STATES OF AMERICA

v.

ELLIOT CARTWRIGHT
a/k/a DARYL ATKINS

Elliot Cartwright
            Appellant

———————

On Appeal From the United States
District Court For the
Eastern District of Pennsylvania
(D.C. Crim. Action No. 02-cr-00581-2)
District Judge:  Hon. James T. Giles

———————

Argued January 26, 2004

BEFORE:  NYGAARD, FUENTES
and STAPLETON, Circuit Judges

(Opinion Filed: March 1, 2004)

———————

Patrick L. Meehan
United States Attorney
Laurie Magid
Deputy U.S. Attorney
Robert A. Zauzmer
Assistant U.S. Attorney
Kenya S. Mann (Argued)
Assistant U.S. Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106
  Attorneys for Appellee

Maureen Kearney Rowley
Chief Federal Defender
David L. McColgin (Argued)
Assistant Federal Defender
Curtis Center - Suite 540 West
Independence Square West
Philadelphia, PA  19106
  Attorneys for Appellant

———————

OPINION OF THE COURT

———————

STAPLETON, Circuit Judge:

Defendant Elliot Cartwright ("Cartwright") appeals his conviction and sentence, following a jury trial, for conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (2001), aiding and abetting the distribution of cocaine in violation of 21 U.S.C. § 841 (2001) and 18 U.S.C. § 2 (2001), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (2001).  The sole issue presented by this

appeal is whether the evidence presented by the government at trial was sufficient to support Cartwright's conviction. We conclude that the evidence adduced at trial did not support an inference that Cartwright knew he was participating in a transaction that involved a controlled substance, as opposed to some other form of contraband. Because we have consistently held that such proof is necessary to support a conviction in cases such as this, we will reverse the judgment.

I. Facts and Procedural History

On September 27, 2001, a drug dealer named Prince Muhammed El agreed to cooperate with agents from the Pennsylvania Office of the Attorney General, Bureau of Narcotics Investigation and Drug Control, in arranging for the controlled purchase of three kilograms of cocaine. Muhammed El made the arrangements through his friend, Rashine Ellis, who in turn contacted her supplier, Osiris Jackson. Muhammed El had contacted Ellis through his two-way handheld text messaging device.[1] During a recorded telephone conversation later that day, Muhammed El and Ellis negotiated the terms of the transaction. Muhammed El agreed to purchase three kilograms of cocaine for a price of $90,000. The two also initially agreed that the sale would take place later that day at the Houlihan's or Friday's on City Line Avenue in Philadelphia.[2] After the initial conversation, Ellis changed the location of the transaction to the parking lot of the Bala Cynwyd Shopping Center in Montgomery County, Pennsylvania, just across the Philadelphia city line.

Before going to the shopping center parking lot, Muhammed El first met Ellis at a gas station in the East Falls section of Philadelphia. Muhammed El was accompanied by James Avery, an undercover narcotics agent with the Pennsylvania Attorney General's Office, who posed as Muhammed El's bodyguard and confidant. At the gas station, Muhammed El got out of his car and entered Ellis's silver Mitsubishi Montero, a sport utility vehicle (the "SUV"). Muhammed El then rode with Ellis to the shopping center while Avery followed them in Muhammed El's car. The two vehicles arrived at the shopping center parking lot at approximately 4:45 p.m. Ellis parked her SUV about five to six car lengths from the front door of a Foot

---

[1]Muhammed El later testified that he used the two-way messaging device in drug transactions to avoid the possibility that his conversations would be overheard by others.

[2]During the telephone call, Muhammed El professed a desire that the transaction take place out in the open, where there would be other people to watch and make sure the transaction went smoothly. Ellis also suggested during the telephone call that the only people who would be present at the transaction would be herself, Muhammed El, and Jackson.

Locker store. Agent Avery parked in a space directly across from Ellis's SUV. At that point, the parking lot was under government surveillance.

When they arrived at the parking lot, Ellis contacted her supplier, Osiris Jackson, using her two-way text messaging device. Muhammed El then got out of Ellis's SUV and went to Agent Avery, who remained in Muhammed El's car. Muhammed El told Agent Avery that he would give a signal by lifting his hat as soon as he saw the cocaine. Muhammed El then got back into Ellis's SUV. At that point, law enforcement agents observed Jackson, empty-handed, walking up to the SUV and getting into the rear passenger-side seat. While inside the SUV, Muhammed El, pointing to Agent Avery, told Jackson that he had the money and asked if Jackson had the cocaine. Jackson said that he did have the cocaine and Ellis pronounced that the "deal is good." App. at 96a. Jackson then got out of the SUV and walked through the breezeway at the corner of the mall that led to another parking lot located on the rear side of the mall. The rear parking lot was not under government surveillance.

Several minutes later, Jackson returned through the breezeway, carrying a blue and white paper shopping bag marked with the words "Mr. Denim." Agent Kenneth Bellis, who was conducting surveillance for the controlled transaction, observed that as Jackson walked through the breezeway leading back to the front parking lot and Ellis's SUV, he was walking side-by-side with Defendant Elliot Cartwright. Agent Bellis observed that at one point, Jackson and Ellis were talking to each other, and he could tell that "they were having some kind of conversation." App. at 143a. Jackson and Cartwright walked together through the breezeway for approximately thirty feet and then began to separate. Jackson walked out into the parking area towards Ellis's SUV and Cartwright continued to walk along a path that ran adjacent to the store fronts. Cartwright stopped walking near the Foot Locker. His back was facing a wall that separated the Foot Locker from the store to its left. Cartwright then leaned up against the wall and placed one foot up against it. He was also looking straight ahead, in the direction of Ellis's SUV. The SUV was located about 90 to 100 feet from the Foot Locker.

Meanwhile, Jackson crossed the parking lot and, after taking a loaded firearm from his waistband, entered the SUV. Jackson placed the blue and white shopping bag on its side in the SUV, showing Muhammed El three bricks of cocaine. Muhammed El then gave the pre-arranged signal and law enforcement officers immediately converged on the SUV. The agents recovered from Jackson a loaded firearm with a round in the chamber, a Motorola Timeport two-way text messaging device, the blue and white shopping bag containing the cocaine, and the keys to a Subaru vehicle that was discovered in the rear parking lot and was registered in the name of Jackson's father.

As the agents converged upon Ellis's SUV, Agent Bellis observed Cartwright remove his foot from the wall and saw him going "fairly quickly" into the Foot Locker store. App. at 146a. Agent Bellis radioed for another agent, Edward Rodriguez, to meet him at the Foot Locker. Together, the two agents entered the Foot Locker approximately twenty to thirty seconds after Cartwright. Upon entering the Foot Locker, they saw Cartwright with his back towards them, standing near clothes racks located in the middle of the store. They grabbed Cartwright, patted him down, and recovered from him a loaded semi-automatic firearm with a round in the chamber, a cellular phone, $180 in cash, and a Motorola Timeport two-way text messaging device similar to the one recovered from Jackson. Cartwright was not in possession of any car keys.

At Cartwright's trial, the foregoing facts were developed through the testimony of Muhammed El, Agent Avery, Agent Bellis, Agent Rodriguez, and two other law enforcement agents. In addition, Agent Bellis testified, as an expert in the field of drug trafficking, that drug dealers commonly used lookouts to conduct counter-surveillance in drug transactions and that these lookouts could possess a firearm. The only witness to testify for the defense was Bernard Clark, the assistant manager of the Foot Locker, who told the jury that when Cartwright first came into the store, he asked a saleswoman a question, then looked at some clothing, and then asked the saleswoman another question.

Cartwright's defense counsel moved for a judgment of acquittal under Fed. R. Crim. P. 29 after the close of the government's case and again at the close of all evidence. The District Court denied both motions, holding that sufficient evidence existed to send the case to the jury. Cartwright was found guilty on all three counts. He was sentenced to a term of 140 months of imprisonment, five years of supervised release, a fine of $1,500, and a special assessment of $300. Cartwright filed a timely notice of appeal.

## II. Jurisdiction

The District Court had jurisdiction over this case under 18 U.S.C. § 3231 (2001) because Cartwright was charged with offenses against the laws of the United States. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 (2001) because the District Court's judgment of conviction and commitment was a final decision.

## III. Discussion

Cartwright argues on appeal that the evidence presented by the government was insufficient to support his conviction on any count. First, Cartwright contends that the government failed to show that he was a "lookout" for Osiris Jackson and that all of the evidence presented to the jury was consistent with his innocence. Alternatively, Cartwright claims that even assuming that the government's evidence was sufficient to support an inference he acted as a lookout for Jackson, the

4

government failed to show that he knew that the transaction involved a controlled substance. In reviewing Cartwright's challenge to the sufficiency of the evidence, we apply a "particularly deferential" standard of review. *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). The verdict must be sustained if there is substantial evidence to support it. *Burks v. United States*, 437 U.S. 1, 17 (1978); *United States v. Beckett*, 208 F.3d 140, 151 (3d Cir. 2000). "It is not our role to weigh the evidence or to determine the credibility of the witnesses." *Cothran*, 286 F.3d at 175. "We must view the evidence in the light most favorable to the Government and sustain the verdict if any rational juror could have found the elements of the crime beyond a reasonable doubt." *Id.*

Under this standard of review, we have little difficulty concluding that the evidence is sufficient to support a finding that Cartwright acted as a lookout for Jackson. Moreover, there is ample evidence in the record to suggest that Cartwright knew he was involved in an illicit transaction of some sort. The evidence showed that Cartwright and Jackson had a conversation during a thirty-foot walk through the breezeway, after which Cartwright was seen taking up a position next to the Foot Locker and watching the SUV as Jackson walked to it with the blue and white shopping bag. Cartwright, like Jackson, was armed with a semi-automatic weapon that was loaded and had a round in the chamber.

Cartwright and Jackson also possessed similar two-way text messaging devices. Moreover, the jury heard expert testimony that lookouts are commonly used in drug transactions of this type. While there may have been an innocent explanation for Cartwright's activity,[3] "[t]here is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." *United States v. Iafelice*, 978 F.2d 92, 97 n.3 (3d Cir. 1992) (citing *United States v. Sandini*, 888 F.2d 300, 311 (3d Cir. 1989)). Accordingly, the evidence presented, viewed in the light most favorable to the government, is clearly sufficient to support a finding that Cartwright was acting as a lookout for Jackson. Our cases dictate, however, that merely acting as a lookout is insufficient to sustain a conviction for conspiracy to distribute, or aiding and abetting the distribution of, a controlled substance. *See, e.g., United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991); *United States v. Wexler*, 838 F.2d 88, 90-92 (3d Cir. 1988). Although this evidence may be sufficient to prove that Cartwright knew he

---

[3]For example, Cartwright asserts that on these facts, he may have just been a casual acquaintance of Jackson who happened to run into him in the parking lot, or he may have been a stranger who merely asked Jackson a question, or he may have just been an ordinary shopper who paused to rest before going about his errands.

was participating in some sort of illegal transaction, these facts nonetheless are insufficient to prove beyond a reasonable doubt that Cartwright knew the transaction involved drugs.

"The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *Wexler*, 838 F.2d at 90; *see also United States v. Idowu*, 157 F.3d 265, 266-67 (3d Cir. 1998). "One of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *Wexler*, 838 F.2d at 90-91 (citing *United States v. Kates*, 508 F.2d 308, 310-11 (3d Cir. 1975)); *see also Idowu*, 157 F.3d at 268. "In order for us to sustain a defendant's conviction for conspiracy, the government must have put forth evidence 'tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment.'" *Idowu*, 157 F.3d at 268 (quoting *Wexler*, 838 F.2d at 91).[4] Applying this rule, "[w]e have consistently held in cases of this genre that, even in situations where the defendant knew that he was engaged in illicit activity, and knew

that 'some form of contraband' was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy." *Idowu*, 157 F.3d at 266-67 (citing *United States v. Thomas*, 114 F.3d 403, 405 (3d Cir. 1997); *Wexler*, 838 F.2d at 90). Accordingly, "this court has [consistently] overturned convictions for conspiracy in drug possession and distribution because of the absence of any evidence that the defendant had knowledge that drugs were involved." *United States v. Mastrangelo*, 172 F.3d 288, 293 (3d Cir. 1999) (citing *Idowu*, 157 F.3d 265; *Thomas*, 114 F.3d 403; *Salmon*, 944 F.2d 1106; *Wexler*, 838 F.2d 88; *United States v. Cooper*, 567 F.2d 252 (3d Cir. 1977)).

We also have overturned aiding and abetting convictions for parallel reasons. *See, e.g.*, *Salmon*, 944 F.2d at 1113; *Wexler*, 838 F.2d at 92. A conviction on such a charge "requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it." *Salmon*, 944 F.2d at 1113 (citing *United States v. Dixon*, 658 F.2d 181, 189 n.17 (3d Cir. 1981)); *see also United States v. Bey*, 736 F.2d 891, 895 (3d Cir. 1984); *United States v. Pearlstein*, 576 F.2d 531, 546 (3d Cir. 1978). "[A]cting with intent to facilitate the substantive offense requires that one acted with the 'intent to help those involved with a *certain* crime.'" *Salmon*, 944 F.2d at

---

[4]Moreover, we have held that "[t]he inferences rising from 'keeping bad company' are not enough to convict a defendant for conspiracy. *Wexler*, 838 F.2d at 91.

1113 (quoting *Wexler*, 838 F.2d at 92) (emphasis in original). We have therefore held that a reasonable jury could not have had sufficient evidence to find that a defendant aided and abetted the possession and/or distribution of drugs where "the government did not prove that [the defendant] had knowledge of the [drugs], had knowledge that [the co-defendant] intended to distribute or possess [drugs], or purposefully intended to aid others in committing the crime alleged.'" *Id.* at 1114 (quoting *Wexler*, 838 F.2d at 92).

Based on this well-established precedent, the proper question before us with respect to both the conspiracy and the aiding and abetting charges is "whether there was sufficient evidence that [Cartwright] knew that the subject matter of the transaction was a controlled substance, rather than some other form of contraband, such as stolen jewels or computer chips or currency." *Idowu*, 157 F.3d at 266. Here, the government presented no direct evidence proving that Cartwright knew he was involved in a drug transaction. We have recognized, however, that "[i]nferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and the conclusion inferred." *Id.* at 269 (quoting *United States v. Clemmons*, 892 F.2d 1153, 1159 (3d Cir. 1989); *see also Salmon*, 944 F.2d at 1114 (citing *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989)). On the other hand, in the absence of a logical and convincing connection, *i.e.*, where an inference as to a defendant's knowledge is based upon speculation, our case law forbids us from upholding his conviction. *See Thomas*, 114 F.3d at 406.

The facts of this case undoubtedly evidence the existence of a conspiracy, at least among Rashine Ellis and Osiris Jackson, to distribute cocaine. There is also no question that a distribution of cocaine actually occurred. However, the government can point only to the following facts established at trial as a basis for inferring Cartwright's knowledge of a drug distribution: (1) Cartwright made his first appearance in the breezeway at the same time that Jackson was observed carrying the shopping bag containing the cocaine; (2) Cartwright walked side-by-side with Jackson through the breezeway and the two were observed talking to each other; (3) Cartwright possessed a semi-automatic firearm, a cellular phone, $180 in cash, and a Motorola Timeport two-way text messaging device; and (4) Cartwright did not possess any keys to a vehicle of his own. There is simply no logical and convincing connection between these facts and the inference the government seeks to draw. Rather, that inference is based solely on speculation about a possible prior relationship between Cartwright and Jackson, about how Cartwright got to the mall, and about what Cartwright was doing prior to being sighted with Jackson, matters as to which there is no evidence.

Our conclusion that the foregoing facts

do not support the government's inference follows *a fortiori* from *Thomas*, 114 F.3d 403 and *Idowu*, 157 F.3d 265. In *Thomas*, a drug courier named Lynch agreed to cooperate with law enforcement officers in conducting a planned drug transaction. 114 F.3d at 404. Lynch informed the officers that she had been directed by a man named Petersen to take a suitcase carrying cocaine to a hotel room at the Atlanta Airport Days Inn, leave the suitcase in the hotel room, return the room key to the front desk in an envelope marked "Melvin Smith" or "Cousin Melvin Smith," and then leave the Days Inn for another hotel. *Id.* Lynch performed as directed and the officers set up surveillance of the Days Inn hotel room. Defendant Thomas then obtained the room key from the front desk, was observed entering the designated room, and was arrested upon exiting. Thomas told the officers that he was to be paid $500 to check on a suitcase at the hotel, but he denied having any knowledge that the suitcase contained cocaine. When Thomas was arrested, he was in possession of a cellular phone, a pager, and a nine millimeter pistol. In addition, officers retrieved from Thomas's pager the same telephone number at which Lynch had earlier called Petersen. Furthermore, Petersen's phone records also showed several calls to Thomas's pager and cellular phone, as well as to Thomas's home telephone. We concluded from this evidence that Thomas must have known that he was somehow involved in an illicit activity; however, we held that any conclusion that Thomas knew drugs were

involved was speculative. We noted that even if Petersen had spoken to Thomas prior to the transaction, there was no evidence concerning the substance of the phone calls or showing that Thomas had a prior relationship with Lynch or Peterson. We therefore reversed Thomas's conspiracy conviction.

In *Idowu*, one Monadu Ajao had negotiated to buy two kilograms of heroin from Abdul Khaliq, an informant working with the United States Drug Enforcement Agency ("DEA"). 157 F.3d at 267. The two agreed that the transaction would take place at a Quality Inn in Jersey City, New Jersey. Ajao arrived at the agreed-upon time in a Lincoln Town Car driven by defendant Idowu. Ajao then spoke to Khaliq in the presence of Idowu, although he referred to the subject of the deal as "the stuff" rather than "heroin" or "drugs." *Id.* at 267, 268. During the transaction, Idowu opened the trunk of the Town Car, removed a brown leather bag from the trunk, and then opened the bag to show Khaliq $20,000 in cash. Idowu also assured Khaliq that all the money was there. When Khaliq stated that he would have to take the bag with him, Idowu told him that he had personal documents within it that he would have to remove. After taking the brown leather bag, Khaliq opened the rear hatch of his own car, removed a black suitcase that had been outfitted to contain the heroin in its lining, and placed the suitcase in the still-open trunk of the Town Car. Idowu then opened the black suitcase and, upon seeing nothing inside, told Ajao: "They didn't

8

pack this thing." *Id.* at 268. Ajao then told Idowu to press the suitcase with his hands and Khaliq assured both of them that "something was concealed in the frame of the suitcase." *Id.* Ajao and Idowu were then arrested by DEA agents. From these facts, we concluded that only two inferences were proper: that Idowu had a preexisting relationship with Ajao, and that Idowu knew he was involved in an illicit transaction. However, we held that even if Idowu had been a "trusted" participant in the transaction, the government's failure "to provide evidence that Idowu knew that drugs were in fact the subject matter of the transaction" precluded the jury from inferring that Idowu had knowledge of the nature of the deal. *Id.* at 270. Accordingly, we rejected the government's inference that Idowu must have been aware of the subject matter of the transaction simply because Ajao felt comfortable speaking about the transaction in front of him. We also noted, in passing, that "it is not uncommon for managers of clandestine illegal operations to keep their employees insulated from one another and from the overall plan of operation so that they cannot supply evidence against others involved." *Id.* at 269 n.3.

In this case, as in *Thomas*, Cartwright was found to possess a firearm, a pager, and a cellular phone, and was even observed talking with Jackson. Nevertheless, *Thomas* dictates that, in the absence of any evidence indicating the substance of the conversation with Jackson, any evidence of a prior relationship with Jackson, or any other direct evidence indicating Cartwright's knowledge, the jury could only speculate as to Cartwright's knowledge.[5] Moreover,

_____

[5]Accordingly, we also reject the argument that Cartwright can be inferred to know that he was involved in a drug transaction solely from the nature of items found in his possession at his arrest. Despite our holding in *Thomas*, the government cites to *United States v. Picklesimer*, 585 F.2d 1199, 1204 (3d Cir. 1978) for the proposition that firearms are the tools of narcotics trafficking. In that case, however, we simply addressed whether firearms were relevant to show a narcotics conspiracy for purposes of admissibility. *Picklesimer* did not hold that the presence of firearms was sufficient to prove a narcotics conspiracy beyond a reasonable doubt. In fact, contrary to the government's assertion, we noted that guns are often used to protect contraband in general. *Id.* ("It often happens that illegal enterprises, such as narcotic conspiracies, are ongoing ventures, requiring the use of guns for protection of the contraband . . ."). The government also cites *United States v. Ortiz*, 966 F.2d 707, 714 (1st Cir. 1992) to suggest that Cartwright's two-way messaging device was an accouterment of the drug trade. In that case, however, the Court of Appeals for the First Circuit explicitly stated that "possession of a beeper is not *ipso facto* proof of complicity in the drug trade." *Id.* Rather, the court noted that a defendant's possession of such and item during a drug transaction "'could justifiably raise the

even if we were willing to speculate that Cartwright arrived at the mall in Jackson's car, *Idowu* indicates that such evidence, without more, would still be insufficient to infer that Cartwright knew he was involved in a drug transaction. As in both of those cases, there is simply no evidence in this record from which to infer a conclusion that Cartwright had knowledge of the nature of the transaction.

The government seems to recognize that *Thomas* and *Idowu* do not support its inference as to Cartwright's knowledge. The government therefore argues that we should instead rely on *United States v. Iafelice*, 978 F.2d 92 (3d Cir. 1992) based on the supposition that Cartwright must have, at some point, exercised dominion and control over the cocaine. In *Iafelice*, defendant Mark Iafelice was observed driving his own car to the parking lot of a hotel in which the DEA had arranged a controlled purchase of heroin. Iafelice was accompanied in the car by two conspirators, John Sinde and Thomas Finn, and a brown camera bag containing heroin was located in the trunk. DEA agents testified that Iafelice was driving through the parking lot in a suspicious manner indicative of counter-surveillance. Once the car was parked, the trunk popped open from inside the car and John Sinde retrieved the camera bag. He then walked into the hotel, met his brother, Richard

Sinde, and then engaged in the transaction with an undercover DEA agent. The evidence also indicated that Iafelice, who remained in his car with Finn, used a beeper and a cellular phone to communicate with the Sindes while they were in the hotel during the transaction. Reviewing these facts, we held that the evidence was sufficient to show that Iafelice knew the camera bag contained heroin. Although we noted that the use of the beeper and cellular phone during the transaction supported the inference that Iafelice knew drugs were involved, we held that the "truly distinguishing fact" was his "ownership and operation of the vehicle used to transport the drugs." *Id.* at 97. We reasoned that "[c]ommon sense counsels that an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware, and usually knows what is in that vehicle." *Id.* In context with the other facts presented, we concluded that a jury could have reasonably inferred that Iafelice was in constructive possession of the heroin and therefore could have found beyond a reasonable doubt that he knew that he was involved in a drug transaction.[6]

---

eyebrows of a reasonable jury' when viewed in light of the totality of the evidence." *Id.* (internal citation omitted).

[6]"Constructive possession exists if an individual 'knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.'" *Iafelice*, 978 F.2d at 96 (quoting *United States v. Blackston*, 940 F.2d 877, 883 (3d Cir. 1991)).

The government seizes upon *Iafelice*'s rationale and argues that it should apply in this case as well. In doing so, the government proposes that we assume an entire series of events based on the fact that Cartwright and Jackson both came from the rear parking lot through the breezeway of the Bala Cynwyd Shopping Center at the same time, the fact that Cartwright acted as a lookout during the transaction, and the fact that Cartwright did not possess any car keys. Based solely on these facts, the government asks us to draw the following chain of inferences: (1) that Cartwright arrived in the rear parking lot with Jackson in Jackson's Subaru; (2) that Jackson was unwilling to leave the cocaine unattended during the initial meeting with Muhammed El; (3) that, as a result, Cartwright was designated to sit in Jackson's car during this period; (4) that, in addition be being so designated, Cartwright was given access to the cocaine; (5) that Cartwright exercised dominion over the cocaine; and (6) that, having exercised such dominion, Cartwright must have recognized that the impending transaction involved a controlled substance. All of this, of course, could have happened. But so could countless other scenarios that do not lead to the ultimate inference the government seeks to draw.

Our case law "forbids the upholding of a conviction on the basis of such speculation." *Thomas*, 114 F.3d at 406. In *Iafelice*, our conclusion that the defendant had been in constructive possession of the heroin was based on observed activity.

Here, however, the government wishes us to draw the same conclusion based upon the weakest of facts. The government presented no evidence of what occurred in the rear parking lot because that area was not under surveillance. It would be purely conjectural for a jury to consider how and when Cartwright arrived at the rear parking lot. Furthermore, the government presented no basis, other than "common sense," for a jury to conclude that anyone, much less Cartwright, had ever been guarding the cocaine during Jackson's initial meeting. Nor is it reasonable to assume that anyone guarding Jackson's Subaru must have been in actual or constructive possession of the cocaine.[7] Moreover, no evidence was presented as to any of Cartwright's fingerprints on the bricks of cocaine, on the blue and white shopping bag, or inside or outside Jackson's Subaru. Nothing in the record suggested that Cartwright had ever been in possession of the cocaine or had ever been

---

[7]For instance, in *United States v. Terselich*, 885 F.2d 1094, 1095 (3d Cir. 1989), the defendant had been a passenger in a car that was pulled over on Interstate 95. Upon searching the car's trunk, a state police officer discovered cocaine in a secret compartment built into the trunk. We held that while the defendant had shared driving and lodging responsibilities with the driver, and appeared nervous during the stop, that evidence was not enough to support the inference that the defendant knew the cocaine was in the secret compartment. *Id.* at 1098.

inside Jackson's Subaru. The substance of the communication between Jackson and Cartwright in the breezeway was also unknown. The government presented no evidence of any prior relationship between Jackson and Cartwright, and did not present any records from Cartwright's cellular phone or two-way text messaging device that could establish such a relationship. Nor did the government ever show Cartwright to have previously been involved in any drug trafficking activities.

We therefore conclude that the government's argument is speculative and not based on any logical or convincing connection to established fact. Accordingly, we hold that, even when viewed in a light most favorable to the government, the evidence was not legally sufficient to support Cartwright's conviction either for conspiring to distribute, or aiding and abetting the distribution of, cocaine. Because a conviction under 18 U.S.C. § 924(c) requires a finding that Cartwright had engaged in a drug trafficking crime, we hold that his conviction on that count was based on insufficient evidence as well.

## IV. Conclusion

For the reasons set forth above, we will reverse the judgment of the District Court and remand with instructions to enter a judgment of acquittal.

NYGAARD, J. dissenting.

I respectfully dissent. Given the totality of the evidence, I believe the sequence of events proven by the government sufficiently supports the inference that Cartwright was aware he was involved in a drug transaction. Cartwright was in direct proximity to the drugs and, while in such direct proximity, had a conversation of unknown substance with Jackson, who was in knowing possession of those drugs. Additionally, Cartwright first appeared in the parking lot at the same time Jackson reappeared with the drugs. After his conversation with Jackson, Cartwright immediately took up a look-out position over the ensuing drug transaction. This sequence of events creates, in my opinion, a "logical and convincing connection between the facts established and the conclusion" that Cartwright was aware he was involved in a drug deal. *United States v. Idowu*, 157 F.3d 265, 269 (3d Cir 1998)(internal citation and quotations omitted).

For these reasons I would affirm the District Court's judgment.